616 F.2d 528
 1980-1 Trade Cases 63,115
 FRANKLIN MUSIC COMPANY, Appellant,
v.
AMERICAN BROADCASTING COMPANIES, INC., ABC Record and Tape
Sales Corp., WideWorld of Music, Inc. and Albert
S. Franklin.
FRANKLIN MUSIC COMPANY
v.
AMERICAN BROADCASTING COMPANIES, INC., ABC Record and Tape
Sales Corp., WideWorld of Music, Inc. and Albert
S. Franklin.
Appeal of American Broadcasting Companies, Inc. and ABC
Record and Tape SalesCorporation.
FRANKLIN MUSIC COMPANY
v.
AMERICAN BROADCASTING COMPANIES, INC., ABC Record and Tape
Sales Corp., WideWorld of Music, Inc. and Albert
S. Franklin.
Appeal of Albert S. FRANKLIN.
 Nos. 78-2300 to 78-2302.
 United States Court of Appeals
Third Circuit.
 Argued Sept. 5, 1979.
Decided Dec. 21, 1979.
As Amended Dec. 28, 1979, Jan. 8 and Jan. 9, 1980.
 
 David H. Marion (argued), Joseph F. Roda, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., for appellant and cross-appellee, Franklin Music Company.
 Richard F. Stevens (argued), Butz, Hudders & Tallman, Allentown, Pa., for appellee and cross-appellant, Albert S. Franklin.
 Daniel H. Margolis, Allentown, Pa. (argued), Michael D. Ridberg, William D. Appler, Matthew Weston-Dawkes, Ralph C. Thomas, III, Bergson, Borkland, Margolis & Adler, Washington, D. C., A. H. Wilcox, Pepper, Hamilton & Scheetz, Philadelphia, Pa., (of counsel), for American Broadcasting Companies, Inc. and ABC Record and Tape Sales Corp.
 Before SEITZ, Chief Judge, and GIBBONS and SLOVITER, Circuit Judges.
 
 
 1
 GIBBONS, Circuit Judge, announcing decision of the court as to all issues except the civil conspiracy verdict and dissenting in Part II. B. as to the civil conspiracy claim.
 
 
 2
 This case is before us on an appeal by the plaintiff Franklin Music Company (FMC) and cross appeals by the defendants American Broadcasting Companies, Inc., ABC Record and Tape Sales Corp. (hereinafter collectively ABC), and Albert S. Franklin (Franklin) from a final judgment in favor of FMC following a jury trial. The complaint alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), section 7 of the Clayton Act, 15 U.S.C. § 18, and various contract and tort claims under Pennsylvania law. The trial court granted motions for partial summary judgment on the section 2 Sherman Act and section 7 Clayton Act claims, from which no appeal has been taken. At the close of the plaintiff's case the court directed verdicts on the section 1 Sherman Act claim and on a count alleging trade libel under Pennsylvania law. The case was submitted to the jury on special verdict interrogatories, and the jury returned a verdict in favor of FMC for $2,013,000 in compensatory damages and $1,025,000 in punitive damages. The verdict reflected the jury's conclusion that the defendants had conspired to injure and destroy plaintiff, that with ABC's inducement and assistance, Franklin had breached fiduciary duties to FMC, and that the defendants had improperly interfered with the business relationship between FMC and its employees. Motions for judgment notwithstanding the verdict followed, and the district court granted those motions in part. The court granted judgment notwithstanding the verdict on the jury's award of damages for interference without privilege in the relationship between FMC and its employees. This left standing an award of $25,000 for damages due to Franklin's breach of fiduciary duty, and an award of $1,311,000 for the defendant's civil conspiracy against FMC. Judgment was entered in these amounts and all parties appealed. The court affirms these awards, but reverses the civil conspiracy award and the judgment notwithstanding the verdict on the employee interference award. We announce herein the opinion of the court as to all issues except the civil conspiracy award, an issue as to which I dissent herein.
 
 I. BACKGROUND FACTS
 
 3
 In 1973 FMC operated a chain of eight retail music stores. Franklin, FMC's president and manager, owned 15% of its stock and the remaining shares were owned by Raymond Rosen & Co., a corporation, whose president, Edward Rosen, was FMC's board chairman. During that year ABC decided to enter the retail music business and began a search for personnel knowledgeable in that field. Franklin, who had had five years of experience with the successful FMC chain and prior experience with the Sam Goody retail music chain, was approached by ABC. Beginning in September 1973, meetings took place between Franklin and ABC, during which his employment by ABC and ABC's possible acquisition of FMC were discussed. While these discussions progressed representatives of ABC visited certain FMC places of business and were shown FMC's point of sale (POS) data processing system, which was alleged to be confidential. Rosen was not informed of these discussions until January 15, 1974, when Franklin told Rosen he was leaving to join ABC and that ABC was prepared to make a purchase offer for FMC. Franklin's employment contract with FMC contained a covenant not to compete with FMC within 50 miles of City Hall, Philadelphia, for one year after Franklin terminated his at-will employment. He went to work in January 1974 at the headquarters for ABC's retail music venture in Cherry Hill, New Jersey, near Philadelphia, but no retail stores were operated by ABC within that fifty mile radius. Following his employment by ABC, Franklin approached various key employees of FMC and successfully induced them to leave FMC and join ABC. In the meantime discussions, which eventually proved to be unfruitful, were conducted with Rosen concerning ABC's acquisition of FMC. Franklin gave interviews to trade journals in which he disclosed ABC's plans and the negotiations for the acquisition of FMC, and predicted that ABC would be more successful than FMC. Following the departure of Franklin and other key people, FMC, which previously had been a profitable venture with an expanding business, began incurring losses. It lost $450,000 in 1974 and $426,000 in 1975. In July 1975, the Sam Goody chain purchased the FMC stores in the Philadelphia area at book value. FMC's Atlanta stores continued in business, incurring further heavy losses, until June 1977, when they were sold at book value to another retail chain.
 
 II. DEFENDANTS' CONTENTIONS
 
 4
 The defendants contend that as to each claim on which FMC recovered, the judgment should be reversed and judgment entered in their favor. They further contend that, even if we find that there was sufficient evidence to warrant submission of those claims to the jury, various trial errors require that we order a new trial.
 
 A. Breach of Fiduciary Duty by Franklin
 
 5
 The jury answered affirmatively the following special verdict interrogatories:
 
 
 6
 1. (a) Did Mr. Franklin while employed by (FMC) breach his fiduciary duty to that company?
 
 
 7
 (b) Did (ABC) induce Mr. Franklin to breach his fiduciary duty to (FMC)?
 
 
 8
 Under Pennsylvania law, Franklin, as president and a director of FMC, owed his undivided loyalty to that corporation. Lutherland, Inc. v. Dahlen, 357 Pa. 143, 151, 53 A.2d 143, 147 (1947). The trial court described the evidence relied on to support a finding that Franklin breached his fiduciary duty as "far from overwhelming," but nevertheless legally sufficient. In reviewing this evidence, the court noted that the record established: that while Franklin was president of FMC, he held several discussions with ABC's management without the knowledge of other FMC personnel, at least six of which meetings took place during FMC's normal business hours; that at ABC's request Franklin guided ABC executives through FMC's stores and instructed his assistant, Terrence Sukalski, to show ABC visitors "whatever they wanted to see" although prior to this instruction it had been the policy of FMC not to disclose certain aspects of its business, in particular its point of sale data processing system, to its competitors; that during his negotiations with ABC Franklin missed two scheduled appointments with Rosen; that in the year prior to his departure, Franklin worked somewhat shorter hours than he had previously, although exceeding forty hours per week; that while he was president ABC executives expressed an interest in acquiring FMC, which Franklin did not disclose to Rosen until January, 1974, when he had already obtained a commitment from ABC for new employment; that while he was negotiating with ABC, Franklin for the first time delegated to a subordinate the task of obtaining advertising rebates and failed to supervise this subordinate, resulting in losses to FMC; that when he did disclose that he was leaving FMC, his conversation with Rosen implied not merely an interest in obtaining employment with better prospects, but actual hostility and an interest in demonstrating his indispensability to the 85% owner of the business; and that while employed at FMC Franklin failed to train others to perform necessary business functions, and so concentrated responsibility in himself as to make it difficult for the business to survive his departure. Some of the evidence referred to was hotly contested. As the court observed, Franklin and Rosen displayed in their testimony a longstanding mutual antagonism. If the jury had credited Rosen, it could have found an intention on Franklin's part, while he was president, to harm Rosen. There was also evidence from which the jury could have inferred that while he was president of FMC he and representatives of ABC discussed the possibility of hiring away other key FMC employees in the event that the company could not be acquired at a price satisfactory to ABC, and that Franklin did not disclose this intention to Rosen, even when he announced his departure. There is evidence from which the jury could have found that he timed his departure in order to maximize his own good, leaving after Christmas so that the peak sale figures from that period would be the basis for calculation of his buy-out price. Moreover, the jury had before it evidence from which it could have found that immediately after announcing his departure, Franklin approached certain key employees about joining ABC, and it was certainly a permissible inference that this was the result of his previous discussions with ABC.
 
 
 9
 The court correctly instructed the jury that, as an officer and director of FMC, Franklin was bound by the strictest duties of honesty and individual loyalty, and could not engage in business conduct detrimental to FMC's best interests. The court also instructed, however, that since Franklin was an at-will employee the jury could not find a breach of his fiduciary duty solely because he sought new employment and failed to disclose that fact to his employer.[1] Rather the jury was instructed that it must also find some specific disloyalty or betrayal of FMC's interests during the time when he was president. The parties did not object to this aspect of the charge, and agree that it accurately reflects the law of Pennsylvania.[2]
 
 
 10
 We agree with the trial court that there was evidence from which a jury could have found specific disloyalty going beyond merely seeking new employment. The jury could have found that Franklin was motivated by feelings of personal hostility to the 85% owner of FMC, that he reduced his attention to FMC's business at a critical time, that he negotiated secretly with a company that had an incentive to purchase the business at a bargain price, that he arranged its affairs so that his departure would cause it maximum distress, and that in the interim he neglected some of the critical aspects of the business.[3] The dissent would have this court substitute its interpretation of the evidence for the findings made by the jury, and would have us do so without having observed the demeanor of the witnesses. The Supreme Court and this circuit have consistently held, however, that when reviewing jury verdicts the appellate court may not redetermine the facts as found by the jury, nor substitute its view of the evidence for that of the factfinder.[4] The scope of this court's review of jury findings is thus far narrower than the clearly erroneous standard to be applied in review of facts found in non-jury trials.[5] Although there is also ample evidence to support contrary findings, we cannot now replace the conclusions that the jury could have made in reaching its verdict with our own view of the facts. Thus, unless we are prepared to hold that as a matter of Pennsylvania law the factual findings that the jury could have made do not amount to a breach of fiduciary duty by the president and director of a corporation, we cannot require the entry of a judgment notwithstanding the verdict on interrogatories 1(a) and (b). The conduct which could have been found went beyond preparing for or accepting new employment in competition with FMC. It amounted to taking up a loyalty to a potential purchaser while at the same time inflicting harm upon the business of the present employer by neglecting its business and by arranging its affairs so that on Franklin's departure that business would suffer.
 
 B. Civil Conspiracy Under Pennsylvania Law
 
 11
 Chief Judge Seitz and Judge Sloviter join to reverse the civil conspiracy verdict, a reversal from which I dissent. Pennsylvania recognizes the tort of civil conspiracy, which is defined as a combination between two or more persons to do an unlawful act, or to do a lawful act by unlawful means, or to accomplish an unlawful purpose.[6] Special verdict interrogatory 5 inquired:
 
 
 12
 5. Did (ABC) and Mr. Franklin conspire together to commit unlawful acts or lawful acts with an unlawful purpose in regard to the alleged breach of a fiduciary duty by Mr. Franklin, or in regard to the alleged systematic inducement of key (FMC) employees, or in regard to the alleged disclosure of trade secrets, for the purpose of destroying (FMC) in order to arrange its acquisition at a depressed price or to otherwise injure plaintiff?
 
 
 13
 The jury answered affirmatively. The interrogatory as framed is consistent with the trial judge's charge, quoted in the margin, a charge to which defendants made no objection.[7] The defendants do not argue that interrogatory 5 misstates the elements of the Pennsylvania tort. Rather, they attack the verdict on that interrogatory on two grounds: insufficiency of the evidence and inconsistency with another verdict answer. I turn first to the sufficiency of the evidence.
 
 
 14
 The jury could have found that a conspiracy arose because of the coincidence of interests of Franklin and ABC. ABC desired to buy FMC at the lowest possible price, perhaps motivated by its obligations to its own shareholders. Franklin, motivated by his personal antagonism for Rosen, failed to reveal to Rosen that ABC desired to acquire FMC and acted so as to maximize the impact of his departure, thus depressing the price at which his new employer could acquire FMC. Thus, the jury could have found a conspiracy to depress FMC's price to ABC. Moreover, there is ample evidence of concert of action among Franklin and various agents of ABC. There is also evidence that the subject of acquiring FMC's business was discussed and that negotiations in preparation for that purchase actually took place. Moreover, there is evidence that ABC participated in Franklin's breach of fiduciary duty by acquiring from Franklin while he was president of FMC, confidential information about FMC's point of sale data processing system. When he became an employee of ABC, Franklin issued false statements to the press, which ABC never corrected, and which the jury could view as part of an effort to depress the market value of FMC. The jury could have found that, even before he left FMC, there was concert of action with respect to an approach by Franklin to other key FMC employees and evidence of a systematic approach, following his departure, to FMC employees who ultimately were hired away and whose loss made it difficult to carry on FMC's business profitably. Assuming for present purposes that it was lawful for ABC to hire Franklin, or any other at-will employee of FMC, solely for its own purposes, it was not lawful to do so in furtherance of a conspiracy to injure FMC in order to acquire its business at a depressed price. Since there was concert of action both with respect to the hiring and with respect to the acquisition, and since the offered price was lower than FMC's owners thought reasonable, the jury could have found from all the circumstances a civil conspiracy under Pennsylvania law.
 
 
 15
 I agree with Chief Judge Seitz that the appropriate evidentiary standard to be applied when civil conspiracy would be proven by circumstantial evidence is the "full, clear and satisfactory" standard.[8] However, that standard is one to be applied by the jury and not a standard for this court to apply independently on appeal.[9] We are thus not free to substitute our weighing of the facts for the weight as determined by the jury. That jury was properly instructed and its verdict, supported by evidence which the jury could have found convincing may not be disturbed by this court.[10]
 
 
 16
 The defendants also urge, however, that the affirmative answer to interrogatory 5 is inconsistent with the negative answer to interrogatory 2, which asked:
 
 
 17
 2. Did (ABC) or Mr. Franklin, for the purpose of crippling and destroying (FMC) rather than obtaining the services of particularly skilled employees, systematically induce key (FMC) employees to leave (FMC) and join (ABC)?
 
 
 18
 The role of this court in reviewing seemingly inconsistent answers to special interrogatories is to search for a reading of the jury's responses that makes them consistent. "Where there is a view of the case that makes the jury's answers . . . consistent, they must be resolved that way."[11] Defendants contend that the negative answer to interrogatory 2 established that the solicitation of FMC employees was not for an unlawful purpose and that therefore any concert of action did not amount to a civil conspiracy. The trial court rejected this contention, pointing out that interrogatory 2 dealt with the separate substantive tort of inducing employees to leave their employment for the purpose of destroying their employer's business.[12] In submitting that interrogatory the court instructed the jury to employ a balancing test to determine whether the purpose to cripple or destroy outweighed the permissible purpose to hire skilled employees for ABC's own business. At most, then, the negative answer to interrogatory 2 established that, on balance, if defendants had a purpose of crippling or destroying FMC by means of soliciting FMC employees, it was outweighed by ABC's purpose of obtaining for itself the services of highly qualified employees. That finding, however, did not preclude the jury from further finding that, notwithstanding this permissible predominant purpose, ABC and Franklin also conspired to depress the market price at which FMC could be acquired.
 
 
 19
 This court need not decide whether the balancing charge on interrogatory 2 correctly stated the governing law of Pennsylvania. It is enough to note, as did the trial court, that there is no inconsistency between the answer to interrogatory 2 and a finding, on interrogatory 5, that the defendants conspired to commit acts for the purpose of injuring FMC enough to depress its sale price. I agree with the trial court that there are no grounds for granting a motion for judgment notwithstanding the verdict on interrogatory 5. Thus, I would affirm the civil conspiracy verdict.
 
 
 20
 C. Damages Awarded for the Torts Found by the Jury
 
 
 21
 The defendants also contend that even assuming tortious conduct they are entitled to judgment notwithstanding the verdict because there was insufficient proof of damages, or at worst that they are entitled to a new trial because the awards which are left standing duplicate elements of damage. The court submitted the interrogatories concerning liability, which included interrogatories 1 and 5, before the jury was permitted to consider damages. Thereafter a separate hearing on damages was held, and further interrogatories dealing solely with damages were submitted. These interrogatories and the jury's answers to them, included the following:
 
 
 22
 1. Were any of the defendants' acts which you found to be wrongful in the first phase of this case a substantial factor in causing loss to (FMC)?
 
 ANSWER: Yes
 
 23
 2. State in dollars, the economic loss incurred by (FMC) which was substantially caused by all the acts of the defendants which you found to be wrongful.
 
 
 24
 $2,013,000
 
 
 25
 3. State in dollars, the amount of the economic loss incurred by (FMC) which was substantially caused by Mr. Franklin's breach of his fiduciary duty.
 
 
 26
 $25,000
 
 
 27
 4. State in dollars the amount of the economic loss incurred by (FMC) which was substantially caused by the defendants purposefully inducing (during the period of May to July, 1974) plaintiff's employees to terminate their employment.
 
 
 28
 $677,000
 
 
 29
 5. State in dollars the amount of the economic loss incurred by (FMC) which was substantially caused by the defendants' conspiracy.
 
 
 30
 $1,311,000
 
 
 31
 It is readily apparent that the jury found damages separately for the breach of fiduciary duty, the unlawful inducement of employees, and the civil conspiracy, which when totalled equalled $2,013,000. The court granted judgment notwithstanding the verdict on the $677,000 award, a matter which we discuss in Part III. F., infra. Here we are concerned with the findings that $25,000 in damages was occasioned by Franklin's breach of fiduciary duty, and that $1,311,000 in damages occurred as a result of the civil conspiracy as defined in interrogatory 5.
 
 
 32
 The alleged breach of fiduciary duty occurred during the time when Franklin was president and manager of FMC. As we have noted, there was evidence from which the jury could have found that during that time Franklin was no longer acting with undivided loyalty to FMC, but had entered into a course of conduct harmful to his employer. From the evidence the jury also could have found, however, that most of the harm resulting from that course of conduct did not occur while Franklin remained an employee of FMC; it was not until after Franklin's departure that large losses were incurred by FMC. There is, however, one item of damage that the jury probably attributed to Franklin's breach of fiduciary duty and which was incurred while Franklin was still an employee of FMC. In the damage phase of the trial, FMC offered evidence from which the jury could have found that while he was negotiating with ABC, Franklin delegated to an untrained subordinate the important duty of obtaining advertising rebates, that he had not previously delegated this responsibility, but had performed this task personally, and that this duty was neglected by both Franklin and the unsupervised subordinate. As a result $25,000 in advertising rebates to which FMC ordinarily would have been entitled was lost because applications for the rebates were not timely made. The jury award in answer to damage phase interrogatory 3, dealing with damages resulting from the breach of fiduciary duties, is for precisely the amount of lost rebates.
 
 
 33
 The defendants contend that the evidence concerning the $25,000 amount was not presented in the liability phase of the case and thus cannot be considered as evidence supporting the finding of a breach of Franklin's fiduciary duty. We do not rely on it for that purpose. There is in the record on the liability phase other sufficient evidence from which the jury could find a departure from the standard of undivided loyalty. There is evidence in the damage phase from which the jury could have found that Franklin's divided loyalty resulted in neglect on his part, to which the loss of $25,000 was attributable.
 
 
 34
 As the trial court pointed out, there is also evidence of Franklin's salary and of the value of the time he spent negotiating with ABC when he should have been managing FMC. Although the trial court could not determine precisely which evidence the jury relied upon in arriving at the $25,000 award, we hold that the court properly concluded that there was sufficient evidence from which an estimate of damages caused by the breach could have been made. No more is required by Pennsylvania law. Ashcraft v. C. G. Hussey & Co., 359 Pa. 129, 132-33, 58 A.2d 170, 172 (1948) ("reasonable quantity of information must be supplied . . . so that the jury may fairly estimate the amount of damages from the estimate"); see Marrazzo v. Scranton Nehi Bottling Co., 422 Pa. 518, 525, 223 A.2d 17, 21 (1966) (evidence must be sufficient to support verdict without resort to conjecture); Smith v. Bell Tel. Co., 397 Pa. 134, 138, 153 A.2d 477, 479 (1959). The defendants' motion for judgment notwithstanding the verdict in the amount of $25,000 for breach of fiduciary duty was therefore properly denied.
 
 
 35
 The loss attributed by the jury to the civil conspiracy is equal to the amount of all actual losses incurred by FMC in the fiscal years 1974 through 1977. Based upon the evidence referred to in Part I. B., supra, and upon other evidence concerning the key role Franklin played in FMC's prior successes, the jury could have found that these losses would not have been incurred but for the acts of defendants in furtherance of the conspiracy. ABC complains that $130,000 of the $1,311,000 of losses accrued in fiscal year 1974 prior to October, 1973, and was the result of start up expenses of new stores and other factors, and was not attributable to any acts of defendants. The jury could well have concluded, however, that had Franklin not joined in a civil conspiracy that $130,000 would have been earned in the period after January 1, 1974, and therefore that the loss for the earlier period would have been eliminated. Since there is evidence upon which a reasonable estimate of damages could have been made by the jury, the verdict may not be disturbed.
 
 
 36
 Nor are we persuaded that there has been a duplication of damages. The trial court instructed the jury that it should find damages separately for each alleged tort and there is no indication that this instruction was disregarded. As we have pointed out, the $25,000 award probably reflects a determination that that specific revenue loss occurred as a result of Franklin's breach of fiduciary duty, while the accumulated losses were found to have been attributable to the conspiracy. There was evidence, including expert accounting testimony, sufficient to permit the jury to assess the damages in a nonspeculative manner, consistent with the requirements of Pennsylvania law. We will not impose in favor of a tortfeasor a rule that a verdict will be set aside in the absence of certainty as to the accuracy of the jury's estimate.
 
 D. Trial Errors
 
 37
 The defendants further contend that even if the verdict should not be set aside for lack of evidence, a new trial must be ordered because of various trial errors. We turn to these alleged errors.
 
 
 38
 (1) Bifurcation
 
 
 39
 Franklin argues that the trial court erred in bifurcating the liability and damages phases of the trial. He relies, in particular, on a statement by the trial judge that he believed that every trial should be so bifurcated. The record discloses, however, that the court made an independent determination that bifurcation was appropriate in this case. Thus the trial court exercised the informed discretion to bifurcate which this court has held is required. Lis v. Robert Packer Hosp., 579 F.2d 819, 825 (3d Cir.), cert. denied, 439 U.S. 955, 99 S.Ct. 354, 58 L.Ed.2d 346 (1978). The case was complex, involving nine separate counts alleging state and federal law grounds for recovery. There were four separate parties. The pretrial order provided for 73 live witnesses, 353 exhibits, and hundreds of pages of deposition testimony to be read into the record. The trial would in any event be a long one, but could have been considerably shorter, had the jury decided in favor of the defendants in the liability phase. The court considered all of these factors in ordering bifurcation over the objection of all parties. On this record, we cannot hold that this ruling was an abuse of discretion.
 
 
 40
 Nor are we persuaded by Franklin's claim of prejudice. He argues that bifurcation eliminated, in the liability phase, the requirement of a finding of impact, while the damage awards were preordained by the reluctance of the jurors to erase their liability verdicts. This argument is entirely speculative. The liability phase of the case was submitted with appropriate instructions and detailed interrogatories, and on the damage phase the interrogatories were carefully tailored to the liability determinations. Thus, we reject defendants' arguments that a new trial is required because of improper bifurcation.
 
 
 41
 (2) Confusing Special Verdict Interrogatories
 
 
 42
 Defendant Franklin also contends that the special verdict interrogatories on the separate Pennsylvania law torts of employee inducement and conspiracy were hopelessly misleading, duplicative, and confusing and resulted in inconsistency requiring a new trial.[13] We here consider Franklin's contention that confusion over liability interrogatory 4, which concerned defendants' alleged purposeful inducement of FMC's employees, in some way tainted the verdict on interrogatory 5 concerning defendants' conspiracy. The jury answered affirmatively interrogatory 4:
 
 
 43
 (a) Did (ABC) purposefully induce or cause (FMC) employees to discontinue their business relationship with (FMC) without a privilege so to do?
 
 
 44
 (b) Did Mr. Franklin, after leaving (FMC), induce or cause (FMC) employees to discontinue their business relationship with (FMC) without a privilege so to do?
 
 
 45
 It also answered affirmatively interrogatory 5, quoted in Part II. B., supra. The source of the confusion, according to Franklin, is that the court instructed the jury that in considering whether there was a civil conspiracy it could consider the claim of the plaintiff under interrogatory 4 as well. That instruction was obviously correct, for inducement of employees might well evidence a conspiracy to harm FMC so as to reduce its market price. Thus the affirmative answers to interrogatories 4(a) and 4(b) are entirely consistent with the affirmative answer to interrogatory 5.
 
 
 46
 The trial court, however, granted defendants' motion for judgment notwithstanding the verdict on interrogatories 4(a) and 4(b). The defendants urge that this action, which we consider in Part III. E., infra, mandates a new trial because the jury may have relied on its verdicts on 4(a) and 4(b) in finding liability on interrogatory 5. We need not decide what effect the judgment notwithstanding the verdict on interrogatory 4 would have on the civil conspiracy verdict under interrogatory 5, for in Part III. E., infra, we conclude that the verdict on interrogatory 4 should not have been disturbed. The two interrogatories were addressed to separate torts under Pennsylvania law. Evidence of the tort of interference with employees was relevant on the civil conspiracy count, and the defendants could properly be found to have committed both torts. There is no indication that the jury was confused by the interrogatories, and thus we reject defendants' contention that a new trial is required on this ground.
 
 
 47
 (3) Exclusion of Testimony
 
 
 48
 The defendants offered the testimony of Larry Golinski, FMC's Atlanta Regional Manager, to rebut the plaintiff's damage evidence and to prove that the losses suffered in FMC's Atlanta stores were not caused by ABC. Golinski's testimony and that of several other witnesses, including some witnesses offered by FMC, was excluded because the parties failed to list those witnesses within the time restrictions set forth in the court's pretrial order. The defendants did not satisfy the court that their failure to list the witness Golinski in the time specified in the pretrial order was excusable neglect. The court found that FMC would be prejudiced because of the probable necessity of disrupting the orderly and efficient trial of the case so as to afford it the opportunity for discovery respecting Golinski's testimony. Finally, the court noted that any prejudice to the defendants caused by the exclusion could be cured by resort to the testimony of other available witnesses. Recognizing that exclusion of critical testimony by unlisted witnesses is disfavored, Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977), we note that the trial court's exclusion of evidence because of the failure of counsel to adhere to a pretrial order will not be disturbed on appeal absent a clear abuse of discretion. De Laval Turbine, Inc. v. West India Indus., Inc., 502 F.2d 259, 263-64 (3d Cir. 1974). The trial judge took into account all of the relevant considerations and we cannot say that, in weighing them when making the Golinski ruling, he abused his discretion. We therefore decline to order a new trial on this ground.
 
 
 49
 (4) Argument by Counsel for FMC
 
 
 50
 Finally, relying on Draper v. Airco, Inc., 580 F.2d 91 (3d Cir. 1978), defendants contend that the arguments of FMC's counsel were so inflammatory and improper that a new trial should be granted. Id. at 94-95. The trial court rejected this contention. Observing that both sides were well represented by aggressive counsel, the court noted that the questioning of witnesses by FMC's attorney was entirely appropriate and that his argument to the jury did not exceed the scope of the evidence. There were references to the economic strength of the defendants as compared to that of the plaintiff. Evidence of this economic disparity was properly admitted in this case because one of plaintiff's contentions was that ABC and Franklin were engaging in predatory acts aimed at acquiring FMC's business. The arguments of FMC's counsel are not grounds for a new trial.
 
 E. Summary
 
 51
 Thus we reject the defendants' contentions that the $25,000 award should be set aside and judgment entered instead in their favor. We reject, as well, their contention that they are entitled to a new trial on the breach of fiduciary duty count. Chief Judge Seitz and Judge Sloviter reverse the civil conspiracy award, a reversal from which I dissent herein.
 
 III. PLAINTIFF'S CONTENTIONS
 
 52
 A. Directed Verdict on the Negative Covenant Claim
 
 
 53
 The contract of employment between FMC and Franklin provided:
 
 
 54
 Franklin agrees that if his employment with the Company shall for any reason terminate, he will not for a period of one year following such termination in any way serve or be connected with or have any interest in any business operating within 50 miles from City Hall, Philadelphia, Pennsylvania, which shall compete in any respect with the business then being conducted by the Company.
 
 
 55
 The business of FMC was the sale at retail of records, phonographs, radios, televisions, musical instruments, and related products. Franklin went to work for ABC in Cherry Hill, New Jersey, well within fifty miles from City Hall. However, ABC did not engage in music retailing within that radius. Indeed the evidence is that during the life of the covenant ABC's only retail outlets were in Seattle, Washington, and Providence, Rhode Island. The trial court concluded that a directed verdict should be entered on the count charging a breach of the post employment negative covenant. We have examined the evidence in the light most favorable to FMC, and we agree that there was no evidence from which the jury could find a breach of the covenant. During the year following Franklin's departure from FMC there was no competition within the fifty mile radius between ABC and the business being conducted by FMC, as that business was defined by the contract. Serving as a manager of ABC's retail music business elsewhere, from an office in Cherry Hill, was not a breach of the covenant by Franklin.
 
 
 56
 B. Directed Verdict on the Trade Libel Claim
 
 
 57
 After he left FMC's employ, Franklin made statements to certain trade publications that FMC claims were defamatory under Pennsylvania law. The statements complained of are of two types: statements to the effect that Franklin wanted ABC to, or that ABC was prepared to, make an offer to buy FMC from Rosen; and statements alluding to ABC's goal of opening 100 music stores within 5 years, as facetiously compared to FMC's goal of opening 100 stores in 120 years.
 
 
 58
 Under Pennsylvania law, whether agiven publication is capable of defamatory meaning is, in the first instance, a question for the court and not for the jury.[14] We have followed this allocation of functions in diversity defamation actions.[15] Pennsylvania applies the definition of defamation found in Restatement of Torts § 559 (1938), which provides that "(a) communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Id.; see Cosgrove Studio & Camera Shop, Inc. v. Pane, 408 Pa. at 318, 182 A.2d at 753.
 
 
 59
 The trial court concluded that the statements attributed to Franklin could not, as a matter of law, have a defamatory meaning. We have examined each of the statements independently and have reached the same conclusion. Franklin did not impute to FMC insolvency, financial embarrassment or credit unworthiness.[16] The statements of desire or intention to purchase could not be understood as disparaging. The statement concerning the anticipated success of ABC and the facetious reference to FMC's slower anticipated rate of growth, simply could not be construed by reasonable jurors as falling within the terms of the Restatement's definition of defamation. See Restatement of Torts § 559 (1938).
 
 
 60
 C. The Directed Verdict on the Sherman Act Claim
 
 
 61
 The jury found that there was a civil conspiracy to injure FMC. Plaintiff here contends that the evidence that supports the conspiracy verdict also sufficed to send the plaintiff's claim under section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), to the jury. The court directed a verdict on this count at the end of the plaintiff's case. Thus the defendants' evidence on that count is not before us, and at best a new trial would be required. The trial court refused to order a new trial, declining to hold that the intentional commission of the state tort of civil conspiracy directed against a business in interstate commerce established a per se violation of the Sherman Act. Rather, the court held, a rule of reason analysis was appropriate. Under such an analysis FMC was required to show a substantial impact on or restraint of trade affecting competition in a product market.[17] FMC failed to introduce any evidence with respect to the existence of any competition between itself and defendants or any impact on its competition with others. The trial court held that the failure to introduce evidence of an anticompetitive effect in the retail music market was fatal to FMC's Sherman Act claim.
 
 
 62
 If, under the governing law, a showing of anticompetitive effect beyond merely being driven out of business is required, then the ruling of the district court is undoubtedly correct.[18] Under the law of this circuit, a civil conspiracy for a purpose unlawful under Pennsylvania law must be accompanied by proof of an effect upon competition in a defined market in order to make out a prima facie violation of section 1 of the Sherman Act. That being so, we have examined the record to determine if it contains the quantum of proof required by such cases as Evans v. S. S. Kresge Co., 544 F.2d 1184, 1194-96 (3d Cir. 1976), cert denied, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) and American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1246-47 (3d Cir. 1975). We hold that it does not. While I remain personally dubious about the legal proposition that a conspiracy, unlawful under state law, to injure a business in commerce so as to depress its price for purposes of an acquisition, is not a Sherman Act violation absent proof of injury to competition in the line of commerce in which the victim is engaged, the law of this circuit is clear. The directed verdict was proper.
 
 
 63
 D. Judgment Notwithstanding the Verdict on Punitive Damages
 
 
 64
 The jury was asked if FMC was entitled to an award of punitive damages and answered affirmatively. It awarded $25,000 against Franklin and $1,000,000 against ABC. On the defendants' motion for judgment notwithstanding the verdict the trial court set these awards aside, holding that there was insufficient evidence to support the punitive damage awards under Pennsylvania law. The court noted that the quantum of the award bore a reasonable relationship to the compensatory damages which the jury found to be due, and would be sustainable if there were proof of conduct to justify such an award. Under Pennsylvania law, however, an award of punitive damages must be supported by evidence of conduct by the defendants more serious than the mere commission of the underlying tort. Pennsylvania courts recognize the standards governing punitive damages set forth in section 908 of the Restatement of Torts (1938).[19] Therefore, we must look for evidence of aggravated conduct involving bad motive or reckless indifference. Aside from the evidence tending to establish the commission of the substantive torts, or the interference with employees and the civil conspiracy, there is no such evidence. Nor is this a case like Chuy v. The Philadelphia Eagles Football Club, 595 F.2d 1265 (3d Cir. 1978), where the substantive tort itself requires proof of extreme or outrageous conduct intentionally or recklessly engaged in. Id. at 1278-79. Thus we agree with the trial court that judgment notwithstanding the verdict on the punitive damages verdict was proper.
 
 
 65
 E. Judgment Notwithstanding the Verdict on Interference with FMC's Employees
 
 
 66
 (1) The systematic inducing of employes to leave their present employment and take work with another is unlawful when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employes.
 
 
 67
 (2) So also, when the inducement is made for the purpose of having the employes commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection.
 
 
 68
 Id. at 633-34, 136 A.2d at 847. Perceiving in Martucci two bases upon which the defendants might be found liable for the Pennsylvania tort of interference with an at-will contractual relationship, the trial court formulated two separate verdict interrogatories, interrogatories 2 and 4.[20] Examination discloses that interrogatory 2 closely tracks the first Martucci formulation of conduct which would amount to tortious interference, while the second is framed more in the language of the Restatement (First) Torts §§ 767-68. The Restatement (First) of Torts § 766 formulation of the general rule was that one who "without a privilege to do so" induces another not to perform a contract is liable for the harm caused thereby. Section 768 recognized the "privilege" of a competitor, and section 767 listed factors determining the existence of a privilege in general. The Restatement of Torts (Second) abandons the "privilege" formulation. In section 766 it refers to "intentionally and improperly" interfering with the performance of a contract, and in section 766B to "intentionally and improperly" interfering with a prospective contractual relationship. Restatement (Second) of Torts §§ 766, 766B (1977). In place of the listing of factors determining the existence of a privilege, section 767 of the Restatement Second lists factors determining whether the interference is "improper." These factors include:
 
 
 69
 (a) the nature of the actor's conduct;
 
 
 70
 (b) the actor's motive;
 
 
 71
 (c) the interests of the other with which the actor's conduct interferes;
 
 
 72
 (d) the interests sought to be advanced by the actor;
 
 
 73
 (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other;
 
 
 74
 (f) the proximity or remoteness of the actor's conduct to the interference; and
 
 
 75
 (g) the relations between the parties.
 
 
 76
 Id. § 767. These general rules for determining the propriety of interferences are refined in section 768(1) which deals specifically with competition as a proper or improper interference with existing or prospective contractual relations. That section provides:
 
 
 77
 One who intentionally causes a third person . . . not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
 
 
 78
 (a) the relation concerns a matter involved in the competition between the actor and the other and
 
 
 79
 (b) the actor does not employ wrongful means and
 
 
 80
 (c) his action does not create or continue an unlawful restraint of trade and
 
 
 81
 (d) his purpose is at least in part to advance his interest in competing with the other.
 
 
 82
 Id. § 768(1). The Supreme Court of Pennsylvania has now substituted the intentional and improper formulation of the Restatement (Second) for the old privilege formulation. Adler, Barish, Daniels, Levin, Etc. v. Epstein, 482 Pa. 416, 431-34, 393 A.2d 1175, 1183-84 (1978), appeal dismissed, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979). That case involved interference in the at-will contractual relationship between a law firm and its clients by former associates of the firm. The case focused on activities by the firm's associates both prior to and following the termination of their employment, but while they still had access to the firm's premises. Obviously upon the termination of their employment they became actual competitors of the firm, and prior thereto they were potential competitors. The court applied the standards of section 767 rather than the specific treatment of interference by a competitor dealt with in section 768. Id. This suggests that when the interference involves the activity of a present or former employee the general standards of section 767 rather than those of section 768 apply, even though the employee is a potential or actual competitor. How the Pennsylvania court would treat concert of action between present or former employees and a third party competitor the fact pattern in the instant case is not disclosed in Adler, Barish. It does seem clear from that case that earlier opinions of the Pennsylvania Supreme Court remain reliable guides to the tort of interference with at-will employees.[21] In Adler, Barish however, that court greatly expanded the permissible bases for tort liability. The significance of the revised Restatement is that it is no longer necessary that the interference be independently tortious; it is actionable so long as it is improper. See Restatement (Second) of Torts § 767, Comment h. Moreover, the comments to the Restatement Second make clear that factors to be considered in determining whether an interference is improper include "(r)ecognized standards of business ethics and business customs . . . concepts of fair play and whether the defendant's interference is not 'sanctioned by the rules of the game.' " Id. § 767, Comment j. The Pennsylvania Supreme Court's adoption of the Restatement Second thus permits finding ABC and Franklin liable on the ground that they violated the accepted rules of fair play, whether or not their conduct could be said independently to be tortious. The court thus charged that two separate courses of conduct with respect to employee inducement were actionable under Pennsylvania law. The first, systematic inducement for the purpose of destruction, was covered by interrogatory 2. The second, covered by interrogatory 4, was defined by reference to Restatement (First) Torts §§ 767 and 768. We reject defendants' contention that interrogatories 2 and 4 were duplicative or confusing and we hold that interrogatory 4, read in the light of the court's charge, satisfies Pennsylvania law.
 
 
 83
 Since verdict interrogatory 4, as charged, set forth a proper basis for liability under Pennsylvania law, the propriety of a judgment notwithstanding the affirmative verdict on that interrogatory depends upon the sufficiency of the evidence. We must determine "whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." Vizzini v. Ford Motor Co., 569 F.2d 754, 758 (3d Cir. 1977) (quoting Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205, 1211-12 (3d Cir. 1970) (applying Pennsylvania law)).
 
 
 84
 In granting defendants' motion for judgment notwithstanding the verdict on interrogatory 4, the trial court started with the generally recognized rule that an employer is not free to restrict the post employment activities of his at-will employees, or to prevent them, while employed, from looking for other employment. See United Aircraft Corp. v. Boreen, 284 F.Supp. 428, 442 (E.D.Pa.1968), aff'd, 413 F.2d 694 (3d Cir. 1969); Spring Steels, Inc. v. Molloy, 400 Pa. 354, 357, 162 A.2d 370, 374-75 (1960). As a necessary corollary of that principle, other employers are free to compete with the first employer for the services of at-will employees. The Restatement formulations in both versions of section 768 recognize that corollary. But as Martucci and Adler, Barish illustrate, the fact that the contractual relationship is at-will does not mean that it is completely beyond the protection of the law.
 
 
 85
 The trial court found that in inducing FMC's employees to leave their employment with FMC there was no evidence from which the jury could have found that defendants resorted to improper means. We do not agree. From the evidence discussed in Parts I and II, supra, the jury could have found that the initial approach to Franklin by ABC was motivated by ABC's intention to seek to acquire FMC's business. It could also have found that ABC and Franklin joined in a civil conspiracy to accomplish that acquisition at a depressed price, at a time when Franklin was still serving as an officer and director of FMC. It could have found that Franklin's initial approach to FMC's employees on the day on which he terminated his employment was the result of that preexisting conspiracy. It could have found that while the conspiracy continued, approaches were made to other employees, and that one employee of FMC was encouraged to recruit other FMC employees while he was still on its payroll. It could have found that FMC's employees were encouraged to depart at such times as would adversely affect FMC's business and thus affect the market price for that business. Pennsylvania would hold that such conduct is evidence of an improper motive under sections 767(b) and 767(c) and evidence of the resort to wrongful means under section 768(1)(b) of the Restatement (Second) of Torts. Encouraging a breach of fiduciary duty and civil conspiracy are, after all, wrongs. If those wrongs are related to the interference with employment, as on this record they can be, the civil tort of interference with a prospective relationship with an at-will employee under Pennsylvania law has been made out.
 
 
 86
 The trial court relied on two factors in rejecting this analysis. First the court observed that the jury's answer to interrogatory 2 established that the defendants had at least a primary purpose to benefit themselves in a business sense by hiring plaintiff's employees. We do not agree that the affirmative answer to interrogatory 2 established that fact; the answer equally supports the hypothesis that the defendants did not want to destroy FMC, but sought only to depress its sales price. Even if we interpret the answer as did the trial court, it still must be reconciled with the finding, on interrogatory 5, that the defendants engaged in a civil conspiracy directed at FMC. The jury could have found on the record evidence that the defendants' motives were mixed, and that while the first factual basis for liability set forth in Martucci had not been satisfied, the second had. Second, the trial court relied on the negative jury verdict on interrogatory 3, which inquired whether ABC or Franklin had misappropriated trade secrets. Such a theft would, under Pennsylvania law, be separately actionable. Such a theft, accomplished through inducement of employees, would also be actionable under the Restatement formulation. Restatement (Second) of Torts §§ 766-768 (1977). The fact that the particular improper motive of theft of trade secrets was not found in no way negates the possibility on this record the probability that the jury found another improper motive and other wrongful means. We refer, of course, to the motive of depressing the acquisition price and the means of encouraging a breach of fiduciary duty and of civil conspiracy. Under all of the circumstances of this case we cannot hold as a matter of law that the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief. The judgment notwithstanding the verdict on interrogatory 4 was improper.
 
 F. Damages for Interference With Employees
 
 87
 Because the trial court granted judgment notwithstanding the verdict on interrogatory 4 it was not necessary for it to consider the defendants' objections to the amount of damages, $677,000, which the jury attributed to that tort. Since we have held that the liability verdict should stand, we must consider those objections. They are twofold: that the damages are entirely speculative and that they are duplicative of those found on the civil conspiracy claim. We reject both objections.
 
 
 88
 As to the defendants' second contention, the jury was instructed not to duplicate damages, and nothing in the record suggests that it disregarded that instruction. Indeed it seems clear that it attributed $25,000 in lost advertising rebates to Franklin's breach of fiduciary duty occurring prior to January 1974, $1,311,000 in losses to the defendants' conspiracy, and $677,000 to the acts of interference with the plaintiff's employees. The total award is well within a range of damages supportable by the evidence, and we see no reason why judgment should not be entered for the full amount.
 
 G. Summary
 
 89
 Thus we reject FMC's challenges to the directed verdicts on its negative covenant, trade libel and section 1 Sherman Act claims, as well as its challenge to the entry of judgment notwithstanding the verdict on its punitive damage claim. We agree, however, that the trial court erred in granting judgment notwithstanding the verdict on interrogatory 4, and that judgment on that claim should be entered in the plaintiff's favor in the amount of the $677,000 found by the jury.[23]
 
 IV. CONCLUSION
 
 90
 Judge Sloviter would concur in the result of all parts of this opinion except for Part II. B. As to Part II. B., the civil conspiracy claim, Chief Judge Seitz and Judge Sloviter would reverse the trial court's decision to sustain the jury verdict. Therefore, the judgment appealed from will be affirmed except with respect to the civil conspiracy verdict, which will be reversed, and the judgment notwithstanding the verdict on interrogatory 4, which will be reversed with directions to enter judgment in favor of the plaintiff in the amount of $677,000. Costs will be taxed in favor of FMC.
 
 
 91
 SLOVITER, Circuit Judge, concurring in part.
 
 
 92
 I concur with Judge Gibbons in all portions of his opinion except for his affirmance of that part of the judgment sustaining the award of damages for the civil conspiracy. (Section II. B. of the majority opinion). I write separately as to the directed verdict on the Sherman Act claim and judgment notwithstanding the verdict on interference with FMC's employees (Sections III. C. and III. E. of the majority opinion).
 
 I.
 Civil Conspiracy Under Pennsylvania Law
 
 93
 I agree with Chief Judge Seitz that the trial court's decision sustaining the jury's verdict of $1,311,000 on the civil conspiracy claim must be reversed but my decision is based on different reasons. The trial court held that the jury could have found "defendants to have conspired and committed specific acts for the purposes of injuring plaintiff so that they could acquire plaintiff at a depressed price," and that this finding adequately supported a verdict for civil conspiracy under Pennsylvania law.[1]
 
 
 94
 The evidence in support of a finding that the ABC companies possessed the requisite intent to injure plaintiff is considerably weaker than the evidence which supports a finding that Franklin possessed such an intent. There was, as the majority opinion notes, evidence of "longstanding mutual antagonism" between Franklin and Rosen. No such evidence was presented as to the ABC companies. In Pennsylvania, it is a prerequisite to sustaining a verdict for civil conspiracy that there have been a commonality of purpose among the various conspirators.
 
 
 95
 A "conspiracy to defraud" on the part of two or more persons means a common purpose supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each understands that the other has that purpose. Ballantine v. Cummings, 220 Pa. 621, 630, 70 A. 546, 549 (1908).
 
 
 96
 To find the requisite intent, Judge Gibbons marshalls the following facts to support his conclusion that a jury could have inferred that ABC conspired to injure FMC in order to acquire its business at a depressed price: ABC was interested in entering the retail music business; it discussed possible purchase of FMC with Rosen; it failed to correct Franklin's false statements to the press; and it participated in other tortious activity directed at FMC, such as the breach of fiduciary duty and the interference with FMC employees. Were I free to substitute my judgment for that of the jury, it is unlikely that I would have reached a similar result. However, under the clear law of this circuit, we are not free to do so. Therefore, since I also believe the above scenario contained at least the minimum quantum of evidence necessary to create a jury question, it follows that the jury's findings must be accepted. Accordingly, if I did not believe the interrogatory on which the civil conspiracy verdict was founded was inherently defective, I would be required to concur in Judge Gibbons' decision affirming the trial court on this count.
 
 
 97
 I do not affirm the judgment on the conspiracy count because I believe that the conspiracy interrogatory failed to differentiate between the two distinct bases for finding liability for civil conspiracy under Pennsylvania law. As framed, the interrogatory could have caused the jury to confuse its verdict on the conspiracy with its verdict on the substantive torts which were the subject of other interrogatories and are the subject of other recovery in this action. Therefore, a recovery based on an affirmative jury response to the civil conspiracy interrogatory cannot stand.
 
 
 98
 Examination of the definition of the tort of civil conspiracy, as usually formulated in Pennsylvania, evidences two separate and independent grounds for liability. One entails a combination to do an unlawful act, unlawful being, in the civil law, that which is tortious. The other entails a combination to do a lawful act by unlawful means. As will be seen, this does not require use of tortious methods but refers to the element of intent. Some inquiry into the historical development of the civil tort of conspiracy is necessary to understand the distinguishing features of each of the distinct strains of the modern tort.
 
 
 99
 The original tort of conspiracy was primarily connected with the malicious use of civil process.[2] This was remedied by an action on the case, the gist of which was the damage suffered. It developed into the substantive tort of malicious prosecution,[3] after which civil conspiracy apparently lay quiescent for some time. However, when the "modern tort" of conspiracy came into use in the nineteenth century, it was this original line of conspiracy cases which was relied on to support the claim that conspiracy did not exist at all as an independent tort. Authorities holding this view claimed that the tort of civil conspiracy consisted of the unlawful acts causing damage done by each and all of the parties to a conspiracy "and the conspiracy is only important as a circumstance to be taken into account in considering the legality of the act done, and the damage inflicted."[4] There were adherents to this view, both in England and in this country.[5] More than 70 years ago, this circuit held that "in an action on the case for conspiracy the gist of the action is not the conspiracy charged, but the tort working damage to the plaintiff."[6] In a significant decision of the same period, the New York Court of Appeals held that a demurrer should have been sustained because a cause of action for the substantive torts of slander and malicious abuse of legal process had been joined with a cause of action for conspiracy by several of the defendants pursuant to which the slanders and prosecutions were undertaken. There again the court held that the gravamen of the civil action on the case for conspiracy "was not the conspiracy, but the tort."[7]
 
 
 100
 The contrary line of authority holding that conspiracy existed as an independent tort stemmed from a second and newer line of cases with a distinct genesis. According to Holdsworth, the "modern tort" of conspiracy came into prominence in England in the latter part of the nineteenth century as a replacement for criminal conspiracy which, by legislation enacted in 1875, could no longer be used in trade disputes. This enactment did not preclude suit by the person injured by such a conspiracy from bringing a civil action for the damages caused by it.[8] Under this line of cases, the tort of conspiracy corresponded to the crime, and the fact of the conspiracy was the essence of the tort as it was of the crime.[9]
 
 
 101
 The division among the authorities was drawn in the early cases along the issue whether a recovery for the tort of conspiracy could be had against only one of the conspirators. Under the view of those authorities which considered the gravamen of the conspiracy as the wrongful act done pursuant to the conspiracy and the resulting damage, the action could proceed against only one defendant;[10] conversely, those authorities which viewed conspiracy as an independent tort which lay on the foundation of the unlawful combination held that plaintiff could not recover against one of the defendants without establishing a right to recover against all.[11]
 
 
 102
 In an early Pennsylvania case, antedating even the 1875 statute referred to by Holdsworth, the Court held that even if the slanders uttered were not actionable, a conspiracy to utter the slanders would be the basis of a suit, thus recognizing conspiracy as an independent tort.[12] Further evidence that Pennsylvania recognized conspiracy independently is seen in Collins v. Cronin, 117 Pa. 35, 45, 11 A. 869, 870 (1887), where the court stated:
 
 
 103
 (I)n the case in hand the conspiracy was everything. Without it the plaintiff had no cause of action, for the plain reason that the acts charged in the declaration were of such a nature that they could not be committed by one defendant alone.
 
 
 104
 Although no specific discussion of the issue has been located, it appears that the modern Pennsylvania tort of civil conspiracy is a fusion of both lines of cases and makes actionable the tort of conspiracy under either of the antecedent strains. Thus, that division of the present tort which grounds liability on the "combination to do an unlawful act" stems from the earlier conspiracy tort in which the gist of the conspiracy was the tort itself. The other division of the conspiracy tort, that which grounds liability on the combination independent of any substantive tort, "combination to do a lawful act by unlawful means", stems from the cases holding that conspiracy was itself an independent tort.
 
 
 105
 It is necessary to recognize under which aspect of the conspiracy tort the action is proceeding because there are distinct elements and characteristics pertinent to each. A conspiracy which is actionable as a combination to do a tortious act may easily be confused with an action claiming damages for the tortious act itself. In fact, it is questionable whether one should be permitted to recover for both the substantive tort and the conspiracy to engage in the substantive tort. We have found no Pennsylvania case which permits recovery for both, and no discussion of the issue in the Pennsylvania cases.[13] The cases relied on by the trial court as establishing the general tort of civil conspiracy in Pennsylvania are all cases in which it appears that plaintiffs sued only for the conspiracy, without also claiming damages for the substantive tort.[14] For example, in Fife v. The Great Atlantic & Pacific Tea Co., 356 Pa. 265, 52 A.2d 24, cert. denied, 332 U.S. 778, 68 S.Ct. 42, 92 L.Ed.2d 362 (1947), the complaint alleged a conspiracy having for its object a breach of contract between defendant, The Great Atlantic & Pacific Tea Co., and some independent haulers. The court did not have before it any claim by the plaintiffs to recover damages on the substantive claim of breach of contract. Similarly, in United Aircraft v. Boreen, 413 F.2d 694 (3d Cir. 1969), the plaintiff's allegations with respect to the conspiracy had been unsuccessful in the court below, as had been its claims on the other substantive torts for inducement to breach the employment relationship and breach of fiduciary duty. Thus, neither the trial court nor this court had occasion to consider a situation in which plaintiff was successful before the trier of fact on both the substantive tort and the conspiracy tort.
 
 
 106
 Some discussion of the issue appears in an early Wisconsin case, Patnode v. Westenhaver, 114 Wis. 460, 90 N.W. 467 (1902), where plaintiff sued for conspiracy to defraud her of certain real estate.[15] The court recognized that the action could proceed on the conspiracy, but stated:
 
 
 107
 "The gist (of this action) is the damage suffered by a wrong which was distinct from other wrongs which were in a measure incidental thereto. * * * The cause of action for the conspiracy in such circumstances is a possession by itself, a right to prosecute for the damages caused by the executed fraudulent combination. * * * The right to redress for damages caused by a consummated conspiracy is distinct, so to speak, from the right to redress for wrongs caused in the progress of its execution. It may go against all the members of the combine, and there may be incidental transactions causing damage included in the claim against all, from which causes of action may arise against individual members of the combine. The prosecution of all for the conspiracy may proceed concurrently with the prosecution of one or more members of the combine liable for some element of the damage in another form of action, up to the point of satisfaction, at which point the element satisfied drops out, as there can be but one satisfaction for the same element of damage." 90 N.W. at 473-74 (emphasis added).
 
 
 108
 The decision recognizes that at some point, at least by the time of the final decision, the conspiracy to do the tort merges with an action on the tort itself.
 
 
 109
 This is not to suggest that an action may not be brought both for the substantive tort and the conspiracy to do the substantive tort. The plaintiff may prefer to recover on the conspiracy count because it is likely to demonstrate an aggravation of the damages. The conspiracy throws light on the quality of the acts and the damage flowing thereon. Plaintiff should be able to proceed concurrently on both because s/he may not be successful in proving the substantive tort but may be able to convince the fact finder that there was a conspiracy to injure him or her. On the other hand, plaintiff may be unsuccessful on the conspiracy claim because s/he is unable to convince the fact finder that more than one actor shared the necessary intent or participated in the commission of the tort, but would still be entitled to recover on the substantive tort against the responsible individual defendant.
 
 
 110
 As to ultimate recovery, however, the tort situation differs from the well-established rule in the criminal law that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses.[16] The rationale for the rule in the criminal law is that the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.[17] In the tort law, a suit aims at a far different result damages for the injury inflicted. Great caution must be exercised to avoid a duplication in damages when there is a verdict for both the substantive tort and the conspiracy to do the tort.
 
 
 111
 There is far less likelihood or possibility of duplication in the second division of civil conspiracy, that which requires a combination "to do a lawful act by unlawful means," because, by definition, no tort has been committed. The gravamen of that strain of conspiracy is the combination to do acts with intent to injure another. The early Pennsylvania cases clearly distinguished between the underlying tort and the conspiracy with unlawful intent in connection with the tort of conspiracy to slander plaintiff:
 
 
 112
 * * * A conspiracy to do an illegal thing is actionable, if injury proceed from it; and where the illegal purpose has been executed, it is false and malicious wherever the motive for the conspiracy to execute it was false and malicious. Ex vi termini, a conspiracy to accuse is evidence of its illegality . . . (Where) the uttering of the words in which it (the defamatory charge) is made, is not the gist of the action, they need not be set forth.[18]
 
 
 113
 Thus, a combination may amount to a conspiracy although its object be to do an act which, if done by an individual, would not be an unlawful act.[19] The rationale for such a tort is that the combination itself provides the additional power to oppress individuals, "since there is a power in numbers, when acting in concert, to inflict injury, which does not reside in persons acting separately."[20]
 
 
 114
 Turning to the civil conspiracy verdict in the present case, it is necessary to ascertain which aspect of the civil conspiracy tort was presented to the jury. It is significant in this case because the jury also returned verdicts on two of the underlying torts against all of the defendants, and as noted above, recovery on these verdicts will be sustained by vote of the majority of the panel. Therefore, if the conspiracy count was presented to the jury in a manner which duplicated the substantive torts rather than in a manner which was independent of them, the verdict on the conspiracy interrogatory cannot stand.
 
 
 115
 The interrogatory, when numerals and emphasis are added, reads:
 
 
 116
 5. Did (ABC) and Mr. Franklin conspire together to commit unlawful acts or lawful acts with an unlawful purpose in regard to (1) the alleged breach of a fiduciary duty by Mr. Franklin or (2) in regard to the alleged systematic inducement of key (FMC) employees, or (3) in regard to the alleged disclosure of trade secrets, for the purpose of destroying (FMC) in order to arrange its acquisition at a depressed price or to otherwise injure plaintiff.
 
 
 117
 It is immediately apparent that it contains elements of both aspects of the conspiracy tort since it refers both to the tortious acts and the unlawful intent. The language of the interrogatory ties the conspiracy to the tortious acts: "Did (defendants) conspire . . . in regard to (commission of the three substantive torts . . . for the unlawful purpose?)" The distinction between the alternative theories of recovery under which the civil conspiracy tort can be shown, which might have clarified the difference, was also not made any clearer in the jury instructions. There again the court stressed the relationship between the conspiracy and the underlying torts.[21] It is possible that the interrogatory led the jury to believe that its affirmative verdict against all of the defendants on two of the three substantive torts, the breach of fiduciary responsibility and interference, should, as a matter of consistency, be reflected also by an affirmative verdict on the conspiracy.
 
 
 118
 If so, then the conspiracy verdict duplicates the verdict on the breach of fiduciary duty and the interference with FMC employees. It is no answer to this duplication that in Pennsylvania, the conspiracy is a tort separate from interference. That simply signifies that plaintiff might have recovered under either theory, but does not permit plaintiff to recover for both. Nor could the trial court's cautionary advice to the jury to avoid duplication as to damages excuse what is an inherent duplication in the manner in which the liability interrogatory was presented. It is not necessary here to consider what the result would be had the interrogatory been framed to eliminate any reference to the substantive torts. We need not reach the question whether an interrogatory that merely asked "Did ABC and Mr. Franklin conspire together to commit lawful acts with an unlawful purpose in order to destroy FMC to arrange its acquisition at a depressed price or to otherwise injure plaintiff?" could have been the basis for a recovery for conspiracy in addition to the recovery for substantive torts. That was not the interrogatory that was given.
 
 
 119
 A review of the trial colloquy shows that plaintiff's counsel was aware of the possibility of duplication which the conspiracy interrogatory posed if the jury were to return a verdict on the substantive torts as well as on the conspiracy verdict as raised, but pressed conspiracy as an independent interrogatory because he believed that "sometimes it is easier to prove conspiracy than to prove the act."[22] He conceded that if the jury found in plaintiff's favor on the three underlying torts, the conspiracy interrogatory was immaterial.[23] There is no reason why that is not also true although the jury found in plaintiff's favor on only two of the three underlying torts, since in this case no effort was made to show liability on the third tort, disclosure of trade secrets, arising from the conspiracy as distinct from the substantive tort.
 
 
 120
 Since interrogatory 5 was presented in a manner that was inherently duplicative, reversal of the verdict on the conspiracy count is proper.
 
 II.
 
 121
 Judgment Notwithstanding the Verdict on Interference with
 
 FMC Employees
 
 122
 I do not differ in any significant respect with Judge Gibbons' articulation of the legal principles applicable to the interference tort, but I comment separately because he relies in part on the jury's verdict on the civil conspiracy as the basis on which the jury could have found defendants used improper means. The Restatement (Second) formulation of the interference tort, approvingly adopted in Adler, Barish, Daniels, Levin, etc. v. Epstein, 482 Pa. 416, 393 A.2d 1175 (1978), appeal dismissed, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979), no longer requires any finding of tortious activity. Its broader focus does include the element of improper motive as one which must be considered, but the fact of such improper motive by the defendants was supplied in this case by the jury's affirmative verdict on both interrogatories 4 and 5. Although as noted in Section I. above, interrogatory 5 did not constitute a proper basis for a finding of civil conspiracy, it did require that the jury find improper intent as a necessary element of the tort as it was framed. Therefore, the jury's affirmative finding shows that the improper intent was established. Similarly, the trial court, in instructing the jury regarding interrogatory 4, advised the jury to consider factors under the older "privilege" formulation which are similar to the factors set forth in Section 767 of the Restatement (Second). Therefore, the jury's finding that defendants' interference was not privileged can be equated with the necessary finding under the newer formulation that the defendants acted improperly. Accordingly, the judgment n. o. v. on interference was improper and the jury's verdict on that count should be sustained for the reasons more fully discussed in the majority opinion.
 
 III.
 Directed Verdict on the Sherman Act Claim
 
 123
 I concur in the court's decision affirming the action of the trial court in directing a verdict on the count of the complaint alleging a violation of section 1 of the Sherman Act. I write separately because I believe the issue merits more discussion than is set forth in the majority opinion.
 
 
 124
 There are two distinct bases to Judge Gibbons' affirmance. One deals with the necessity for showing some anticompetitive effect in order to make out a prima facie violation of section 1 of the Sherman Act. The other deals with the way in which behavior which would constitute a tortious conspiracy under state law should be treated under the antitrust laws.
 
 
 125
 There is no need in this case to engage in any extended discussion of the history behind and the rationale for the characterization of conduct into the per se and rule of reason classifications for purposes of the antitrust laws.[24] It suffices to note that the distinction is made essentially for administrative purposes, to relax the evidentiary requirement which would otherwise prevail in those cases which experience has shown involve restraints which are, by their very nature and necessary effect, anticompetitive.[25] Characterization of certain conduct as falling within the per se category eliminates the need to produce evidence that the actors have taken the action with anticompetitive motive or that the action has in fact resulted in injury to competition. The characterization of such conduct has been made by the Court based on its "considerable experience with certain business relationships."[26] There have been occasions when the Court, after initially fashioning a per se rule for a certain type of conduct, has subsequently determined that the absence of demonstrably certain anticompetitive effect and the possibility of economic utility for such an arrangement make utilization of per se treatment unwarranted.[27]
 
 
 126
 This separate evidentiary treatment of restraints under section 1 of the Sherman Act does not mean that those restraints which must be evaluated under the rule of reason stand on any inferior ground under antitrust policy. Although the inquiry is more extended, it is directed to the same end albeit on an ad hoc basis, an analysis of the conduct in light of the overriding value of the Sherman Act to encourage, maintain, and preserve competition. As to that category of restraints the courts simply are unable to make the presumption that the conduct will always fall within the proscription of the antitrust laws, and therefore plaintiffs must shoulder the burden of proving either its anticompetitive purpose or its anticompetitive effect. Naturally, the proof necessary to sustain the burden will vary in each case, since the variations of circumstances are as multiplicious as are the number of interbusiness relationships in our complex highly industrialized economy.
 
 
 127
 In most instances plaintiffs seeking to show a violation of the Sherman Act for a restraint which must be evaluated under the rule of reason standard have done so by attempting to show an anticompetitive effect because it is more easily demonstrable than showing an anticompetitive purpose. That effect may vary from case to case. I do not read the law of this circuit to impose upon antitrust plaintiffs any greater burden than exists elsewhere. Certainly being driven out of business is itself an anticompetitive effect which would amply satisfy the requisite injury requirement. For this, we have no lesser authority than the Supreme Court case of Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), holding that the elimination of one small business is itself anticompetitive notwithstanding the presence of hundreds of other competitors in the area, some within a few blocks of the victim. Similarly, in Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the Court rejected the argument that the antitrust laws would not protect against the destruction of a business simply because the public would still receive the same service through its successor. I see nothing in the decision in Sitkin Smelting & Refining Co. v. FMC Corp., 575 F.2d 440 (3d Cir.), cert. denied, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978), which would derogate from this well-established principle. In that case, after determining that the restraint was not comparable to those falling within the per se category, the court held plaintiffs did not maintain their burden to show anticompetitive effect. The majority noted that such effect could be shown "by controlling market prices, imposing undue limitations on competitive conditions, or unreasonably restricting competitive opportunity." Id. at 448.
 
 
 128
 Nor do I read the cases in this circuit to limit antitrust plaintiffs to a showing of anticompetitive effect in order to recover under the Sherman Act. It is the classic statement of the rule of reason that it can be violated either by a showing of anticompetitive effect or a showing of anticompetitive purpose. "Purpose and effect are disjunctively linked in antitrust analysis, both under the rule of reason and in the application of the per se doctrine."[28] In its most recent restatement to that effect, the Court in United States v. United States Gypsum Co., 438 U.S. 422, 436 n. 13, 98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854 (1978), reaffirmed "the general rule that a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect."
 
 
 129
 Although one might question why anticompetitive purpose should be enough to satisfy the plaintiff's burden, the rationale emerges from the precedents. In Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), Justice Brandeis, in discussing the factors which must be considered in evaluating a restraint under the rule of reason test, stated:
 
 
 130
 The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and predict consequences. (emphasis added).
 
 
 131
 The nexus between predatory intent and injury to competition was also discussed by the Court in another context, when in Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 696 n. 12, 87 S.Ct. 1326, 1333 n. 12, 18 L.Ed.2d 406 (1967), it stated:
 
 
 132
 In (Anheuser-Busch, Inc. v. F. T. C., 289 F.2d 835 (7th Cir.)) the court went so far as to suggest that:
 
 
 133
 "If . . . the projection (to ascertain the future effect of price discrimination) is based upon predatoriness or buccaneering, it can reasonably be forecast that an adverse effect on competition may occur. In that event, the discriminations in their incipiency are such that they may have the prescribed effect to establish a violation of § 2(a). If one engages in the latter type of pricing activity, a reasonable probability may be inferred that its willful misconduct may substantially lessen, injure, destroy or prevent competition." 289 F.2d at 843.
 
 
 134
 Chief Justice Hughes noted in a related antitrust context that "knowledge of actual intent is an aid in the interpretation of facts and prediction of consequences." Appalachian Coals, Inc. v. United States, 288 U.S. 344, 372 (53 S.Ct. 471, 478, 77 L.Ed. 825) and we do not think it unreasonable for courts to follow that lead. (emphasis in original).
 
 
 135
 In a persuasive analysis of the relationship of purpose and effect under section 1 of the Sherman Act, Professor Sullivan has written:
 
 
 136
 There is an implacable logic in condemning conduct on the basis of ill effects, regardless of benign purposes . . . When competitive processes are or will be stifled by particular conduct, it is small comfort that those engaging in it have other ends in view.
 
 
 137
 Correlatively, when the purpose for conduct is itself anticompetitive, there is reason for condemning it on that ground, without meticulous inquiry into whether the market structure will facilitate the achievement of the condemned ends. The fullness of information about structure which is needed for confident prediction about effects is not always at hand; often, relevant information can be gathered only at great costs to the parties and the judicial process, and even then leaves ultimate questions cloaked in uncertainty. Purpose, however, can stand as a surrogate for effects. The actors in the market-place will often be themselves the best judges of what they are capable of achieving and if they are aiming at wrongful ends we may logically treat their purposes as a guide to what they will accomplish. For this reason alone, it is wise policy to inhibit those who try to do wrong, without waiting to determine whether or not they are likely to succeed.[29]
 
 
 138
 Neither of the cases referred to in the majority opinion is irreconcilable with accepted antitrust theory in this regard. In American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1248 (3d Cir. 1975), the court recognized that an agreement violates section 1 of the Sherman Act if it "was designed to achieve a forbidden restraint" even in the absence of any forbidden effect. Because the panel considered the intent and the impact inextricably intertwined in that case ("the trial judge found that the intended effect was the one which was in fact achieved", id.), the case was remanded so that the trial court could explore the reasonableness vel non of the restriction on competition under the circumstances of that case. In Evans v. S. S. Kresge Co., 544 F.2d 1184 (3d Cir. 1976), cert. denied, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977), the court considered the restraint only under the per se rule and found it did not fall within that category because its necessary effect could not be either to "suppress" or "destroy" competition. Plaintiff eschewed reliance on the rule of reason, id. at 1194 n. 30, and the court did not consider its applicability.
 
 
 139
 In the case at issue, the trial court directed a verdict for defendants on the Sherman Act claim because it found that plaintiff failed to carry its burden under the rule of reason standard and plaintiff failed to show that the activity fell within the per se category of restraints. With respect to plaintiff's proof, the trial court noted that plaintiff
 
 
 140
 failed to introduce any evidence at all with respect to the existence of any market, the existence of any competition between itself and defendants, or any impact on competition itself. Plaintiff did not show that ABC a possible potential competitor of plaintiff at any relevant time became a competitor in any relevant market. Nor did plaintiff demonstrate that defendants' acts had any substantial adverse effect on competition, although plaintiff itself may have been injured. Franklin Music Co. v. American Broadcasting Companies, No. 74-2485 (E.D.Pa. Aug. 4, 1978) (Memorandum and Order) (Appendix at 1584).
 
 
 141
 I do not understand the trial court to have held that injury to a competitor would not be a sufficient basis for finding the requisite anticompetitive impact. As noted above, in an appropriate case injury to a competitor may itself demonstrate injury to competition. Plaintiff simply failed to prove that was so in this case. Furthermore, there is no indication that plaintiff produced any evidence that defendants' intent, however malicious in plaintiff's view, was to destroy plaintiff in order to eliminate its competition. Therefore, the trial court had no occasion to consider whether this was an appropriate case to find defendants' actions unreasonable under section 1 of the Sherman Act because of the defendants' anticompetitive intent alone. There is a substantial difference between intent to injure a party which supports a tort recovery and the type of anticompetitive intent on which a Sherman Act § 1 claim can be founded. For example, if two disgruntled customers conspire to burn a department store which would, if accomplished, have the effect of destroying its business, it seems improbable that a court would hold that the intent which suffices to support a claim under state tort law is itself also enough to support a claim for violation of section 1 of the Sherman Act. The anticompetitive intent which acts as a "surrogate for effects" must be targeted directly to the victim in its competitive aspects injury to the victim qua competitor. It follows that plaintiff in this case cannot resurrect its antitrust claim because of its success before the jury on the intentional state tort claims, even though the necessary predicate of that success was the finding of an intent to injure plaintiff.
 
 
 142
 The majority opinion also affirms the trial court's holding that the intentional commission of the state tort of conspiracy did not establish a per se violation of the Sherman Act. This entails consideration of the treatment under the antitrust laws of intentional business torts unlawful under state law.
 
 
 143
 Some of the leading commentators in the field of antitrust purport to see the cases on this issue divided into two lines of authority those which label conduct constituting business torts, such as pirating employees or disparagement of plaintiff's product, as per se violations of section 1 of the Sherman Act and those which apply the rule of reason because of their recognition that such conduct is not always exclusionary.[30] A review of the cases cited makes clear that they do not in fact establish any such per se rule in the sense that neither anticompetitive impact nor anticompetitive intent need be shown. All of the cases are drawn together by the common denominator, noted by the court in each case, that the purpose of the action was to destroy the competition of the plaintiff. Thus in Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir. 1932), cert. denied, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1931), ordinarily cited as the leading case for the proposition that per se treatment under the antitrust laws is appropriate for state unfair competition torts, the court noted at several instances that the Sherman Act claim was affirmed on the basis, in part, of the proven intent to eliminate the plaintiff's competition. For example, the court stated:
 
 
 144
 But we think it is not necessary to show an unreasonable restraint of interstate trade as an accomplished fact, if a conspiracy is proved, the intent and purpose of which, if carried out, would eliminate the largest competitor of one of the conspirators in a particular section of the country, which competitor controlled a substantial part of the trade in that section, and one of the methods of suppressing such competition was unlawful or unfair competition. Such a result, if accomplished, would clearly be an unreasonable restraint of trade.
 
 
 145
 If a conspiracy is proven, the purpose or intent of which is by unfair means to eliminate a competitor in interstate trade and thereby suppress competition, such a conspiracy, we think, is a violation of section 1 of the Sherman Act. It is the intent and purpose which determines the legality of the conspiracy or combination. Loewe v. Lawlor (208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488), supra. If acts done in furtherance of such unlawful purpose though the unlawful purpose is not accomplished to such an extent as to constitute an unreasonable restraint of interstate trade result in injury to a competitor in his business and property, such injured person may recover damages for whatever injuries he has thereby suffered. Id. at 102 (emphasis added).
 
 
 146
 It is evident that the Albert Pick-Barth case is consistent with characterization of state unfair competitive torts as restraints which must be evaluated under the rule of reason standard. As previously discussed, and as confirmed by the court's analysis in that case, absence of anticompetitive impact will not be fatally defective if the requisite anticompetitive purpose can be found.
 
 
 147
 In C. Albert Sauter Co. v. Richard S. Sauter Co., 368 F.Supp. 501, 514 (E.D.Pa.1973), the court sustained a jury's verdict that defendants violated the antitrust laws where "plaintiff alleged and proved by a preponderance of the evidence that the defendants conspired, agreed or had an understanding to engage in acts of unfair competition with the intent to injure plaintiff as a competitor by impairing plaintiff's ability to compete in interstate commerce." The court found that a series of acts performed by the defendants, including pirating of its key employees, selection of a similar name to capitalize upon plaintiff's goodwill and copying of plaintiff's job orders subsequently used to prepare bids competitive with plaintiff, provided ample evidence from which the jury could have found the requisite intent to injure plaintiff. Although the court inexplicably confused the per se category with the rule of reason category by stating that "(c)onspiracies are per se unreasonable when they are accompanied with a specific intent to accomplish a forbidden result", id., and accordingly categorized the conspiracy involved in that case as within the per se category, it is clear that there was a finding of anticompetitive purpose.
 
 
 148
 Similarly, in Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879 (1st Cir. 1960), the court also found that a complaint which alleged the defendants conspired "to destroy plaintiff in its interstate and foreign business" withstood a motion to dismiss under Rule 12(b)(6). There again the court mistakenly stated, in dictum, that the complaint alleged a per se violation but it is apparent from its statement of the question, "whether or not the allegation of a conspiracy to destroy a competitor as alleged here is a per se violation of § 1 so that the rationale of the Klor 's case applies, and, thus, no allegations of further facts showing the basis of public harm and consequent unreasonableness of the restraint are necessary" (id. at 883), that this does not differ from the treatment of restraints under the rule of reason evaluation. Analysis shows that each of the cases cited by Professors Areeda and Turner for the proposition that some courts have found that business torts constitute a per se violation of section 1 of the Sherman Act was one in which the court actually required a showing of the purpose or intent of the activity. In one of the cases, Perryton Wholesale Inc. v. Pioneer Distributing Co. of Kansas, 353 F.2d 618, 622 (10th Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966), the court found both an effect on interstate commerce and that "the intent of the conspiracy was to eliminate the competitor predominant in the area by the subversion of its employees."[31]
 
 
 149
 There are valid reasons why we should be reluctant to classify intentional state torts such as unfair competition or even civil conspiracy as per se violations of the Sherman Act. There are instances when the goal of the antitrust laws in the preservation of competition is inconsistent with the protection of other interests under state tort law.[32] The per se classification would preclude the presentation of evidence of market conditions. It might deter formation of new small businesses composed of some former employees of a dominant company who seek to instill competition into a languid market. Although that was not the situation presented by the facts of this case, use of a per se rule would prevent making such a distinction. Therefore, I believe that the trial court correctly rejected the proposition that the intentional commission of a state tort constitutes a per se antitrust violation. Plaintiff was required to succeed on the basis of its claim that the acts, whatever their status under state tort law, also constituted an unreasonable restraint of trade. Because it failed to do so, it could not recover for a violation of the Sherman Act.
 
 
 150
 SEITZ, Chief Judge.
 
 
 151
 This is one of those cases where an appellate court is confronted with the uninspiring yet important task of evaluating the record in detail to determine whether jury issues were really created. The various answers to the special interrogatories and the facts underlying them cannot be viewed in isolation. When seen as a whole, the evidence does not, in my view, support any of the claims on which the plaintiff succeeded in the district court.
 
 
 152
 Although I agree with Judge Sloviter that the judgment on the civil conspiracy claim should be reversed, in my view there was insufficient evidence to create a jury issue. In addition, I also believe there is insufficient evidence of Franklin's breach of fiduciary duty. Moreover, I reach a different result than my colleagues as to the district court's grant of judgment n. o. v. on the claim of interference with at-will employees. Finally, I agree with their disposition of the remaining substantive claims urged by the plaintiff as grounds for relief.
 
 I. Civil Conspiracy
 
 153
 The doctrine of civil conspiracy has had a stormy history in the common law. For example, it played a controversial role in the fight of labor unions for recognition. See, e. g., Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260 (1917); Fife v. Great Atlantic & Pacific Tea Co., 356 Pa. 265, 52 A.2d 24, cert. denied, 332 U.S. 778, 68 S.Ct. 42, 92 L.Ed. 362 (1947). In light of this history, Pennsylvania, whose law is controlling on this issue, has severely restricted the scope of the doctrine. Thus under Pennsylvania law, "while conspiracy may be proved by circumstantial evidence, the evidence must be full, clear and satisfactory." Blank & Gottschall Co. v. First National Bank of Sunbury, 355 Pa. 502, 50 A.2d 218, 220 (1947). Cf. Landau v. Western Pennsylvania Bank, 445 Pa. 217, 282 A.2d 335 (1971) (allegation in complaint of improper purpose insufficient, making summary judgment proper).
 
 
 154
 Moreover, the state has been especially cautious in using the doctrine where the facts relate to a competitive situation or involve a dispute between employee and employer. E. g., Menefee v. Columbia Broadcasting System, Inc., 458 Pa. 46, 329 A.2d 216 (1974) (dismissal proper where the defendant-employer had a right to terminate contract of plaintiff-employee at will). Accord, United Aircraft Corp. v. Boreen, 413 F.2d 694, 700 (3d Cir. 1969) (evidence insufficient to show agreement between at-will employees who quit and formed a competing firm).
 
 
 155
 With these principles in mind, I turn to the evidence adduced to support the jury's verdict on this question. As an initial matter, I note that the jury's negative answer to interrogatory 2 (inducement of employees with the purpose of crippling Franklin Music) means that the object of the conspiracy was not to drive Franklin Music out of business. Instead, it must be assumed that the purpose of the conspiracy was to depress the price of Franklin Music so that ABC could acquire it. Thus the question is whether there was "full, clear, and satisfactory" evidence that ABC and Franklin conspired to depress the market value of Franklin Music.
 
 
 156
 The first type of evidence offered is the meetings held by Franklin and ABC prior to his termination of his contract with Franklin Music. I agree with the plaintiff that the evidence establishes that Franklin and ABC discussed a possible acquisition of Franklin Music but that is all the evidence discloses. For example, Mr. Rich, the treasurer and controller of ABC Record & Tape, testified:
 
 
 157
 Q: Now, let's go back to Atlanta, when you were with Mr. Franklin. During that time that you were with Mr. Franklin you had some discussions, didn't you?
 
 
 158
 A: Some discussions.
 
 
 159
 Q: And was one of them the fact that Mr. Franklin was suggesting that ABC should acquire Franklin Music?
 
 
 160
 A: The subject was brought up.
 
 
 161
 This statement is typical of those cited by plaintiff and does no more than prove that ABC and Franklin considered buying Franklin Music as an alternative to internal expansion. But one cannot infer from such an expression of interest in purchasing another firm that the parties were unlawfully conspiring to drive down the price of the firm. The fact that ABC considered buying the plaintiff does not by itself permit a reasonable inference of an attempt to harm plaintiff to facilitate the acquisition. Neither the mere fact that meetings occurred nor the content of those meetings as revealed in this record offer circumstantial proof of a conspiratorial purpose.
 
 
 162
 Nor do the internal memoranda of ABC reveal any ABC-Franklin conspiracy to drive down the price of Franklin Music. For example, a report prepared in October 1973 establishes that ABC visited individuals at three companies in addition to Franklin Music to gather information about expansion into the retail record market. Similarly, the expansion and marketing plans drawn up in the winter of 1973-1974 discuss a wide variety of competitors, listing the strengths and weaknesses of each. Every recommendation in the reports is entirely lawful. Thus the only thing these memoranda prove is that ABC, like any cautious entrant into a new market, carefully surveyed the marketing methods, strengths, and weaknesses of its potential competitors. The reports cover a wide range of topics and firms; plaintiff produced no report focusing in on Franklin Music. In short, ABC's own documents do not support an inference of any scheme with Franklin to drive down the price of any of the firms or Franklin Music in particular.
 
 
 163
 Neither can a conspiracy be inferred from the acts of the defendants. For example, plaintiff points to ABC's offer of a price that Rosen felt was too low. I fail to see how a purchase offer, which the evidence shows was developed after careful study by ABC's acquisition department, that the plaintiff rejects as too low can be evidence of a scheme to depress a market price where there is no evidence that the offer was communicated to anyone but the plaintiff. The plaintiff may not elevate differences at the bargaining table, without more, into evidence of an improper motivation.
 
 
 164
 Next, plaintiff argues that the conduct allegedly establishing a breach of fiduciary duty by Franklin demonstrates a Franklin-ABC conspiracy. The proper analysis of this argument is to determine how the jury's total verdict relates to the theories pressed upon it at trial by plaintiff. Assuming for the moment that Franklin breached his fiduciary duty to Franklin Music, see part II infra, the theory that the breach reveals conspiratorial motive is not supported by the jury's answers to the interrogatories or the evidence.
 
 
 165
 At trial, the plaintiff argued that Franklin did a number of improper things, such as neglecting his work, being absent because of meetings with ABC, revealing information improperly to ABC, and structuring his departure to maximize harm to Franklin Music. The jury found a breach of duty but also found that the breach only caused $25,000 in loss to Franklin Music. The evidence demonstrates that the award of $25,000 implicitly rejects all but one of the theories as to breach of fiduciary duty advanced at trial by plaintiff.
 
 
 166
 Plaintiff's theory at trial was that the $25,000 represents advertising revenues lost because Franklin delegated a certain task to a subordinate. A witness expressly tied the exact sum to that event,[1] and plaintiff points to no other alleged loss that comes to that specific amount. Moreover, the jury's apparent belief that Franklin did not neglect his work (whether by design or because of meeting with ABC) except in this one instance was entirely natural: the evidence demonstrates that prior to Franklin's departure, Franklin Music's sales increased, hardly evidence of dereliction of duty. In short, the jury felt that Franklin worked just as hard as before the ABC negotiations with one isolated exception.
 
 
 167
 Nor was there any evidence that once negotiations with ABC started that Franklin began to structure his own duties in a novel manner or neglected to train employees that had been his duty to train. It was Rosen's decision to entrust a large part of the business to an at-will employee, and he cannot now point to that responsibility as evidence of a conspiracy between that employee and his new employer. Moreover, the timing of his departure did no damage. Franklin had no duty to reveal his intention to leave the company. See page 533 & n.1. He left after the Christmas rush, the busiest time of year in the record industry, was over. It seems more plausible to think that a conspirator would pick a more opportune moment to withdraw his valuable services.
 
 
 168
 Finally, in assessing damages, the jury correctly rejected the claim that Franklin Music was harmed by the disclosure of confidential information. Initially, the answer to interrogatory 3(b) establishes that Franklin disclosed nothing improper after his departure. The evidence shows the same is true of events prior to that time. Franklin described one of the visits he and ABC officials made to a Franklin Music store:
 
 
 169
 Q: Were you asked any questions by them after they looked around?
 
 
 170
 A: I was asked general questions about why I believe that this sort of merchandising is better than some of the other types, why I kept my classics in the back, what my feelings were about mixing audio in the same store with records; general questions like that.
 
 
 171
 To the extent Franklin showed ABC what was open to the public, he breached no duty of confidentiality.
 
 
 172
 Plaintiff also points to two other incidents of improper disclosure of information. First, Franklin told an employee to show the ABC officials whatever they wanted. When testifying, the employee did not say what in fact he showed them, making the testimony less than instructive. Second, Franklin permitted ABC to see a "point-of-sale" system, a computer that gives an immediate readout and inventory account on the register tape. The system was designed by IBM and thus presumably was not a trade secret of Franklin Music. In any event, as the award of $25,000 demonstrates, the jury believed these events to have caused plaintiff no damage.
 
 
 173
 In summary, assuming a breach of fiduciary duty, the verdict, read in light of the evidence, shows no more than that Franklin improperly delegated one task to a subordinate that cost plaintiff $25,000. He did not neglect his other duties, as the evidence of sales shows, nor did he reveal anything not generally available. He did not structure his own work or that of any other employee any different than he had prior to the negotiations with ABC, and he did not leave Franklin Music at an inopportune time. In short, the jury found little in Franklin's conduct prior to his employment with ABC that harmed Franklin Music. It therefore could not infer from that conduct that he conspired with ABC to drive down the market value of Franklin Music.
 
 
 174
 Another claimed indicia of a conspiracy is statements made by Franklin to the trade press. In accord with my previous discussion, such an expression of interest in purchasing Franklin Music implies no improper design. Nor can a "facetious" comparison between ABC's goals and Franklin Music's goals be used to infer a conspiracy. Because the statements cannot be taken as derogatory of Franklin Music, one cannot infer from them an intent to depress Franklin Music's market price.
 
 
 175
 The last bit of evidence is that ABC induced eight at-will employees to leave Franklin Music and come with it. As already noted, the jury's answer to interrogatory 2 establishes that ABC's predominant purpose in hiring them was to get qualified employees and not to cripple or destroy Franklin Music. Assuming for the moment that the answer to interrogatory 4 (dealing with ABC's inducement of the employees without a privilege to do so) was supported by the evidence, see part III infra, the answers to interrogatories 2 and 4 as they relate to the conspiracy claim in interrogatory 5 must be carefully delineated. The question is not whether the answer to interrogatory 2 totally precludes a finding of conspiracy, but rather how one may use the inducement of the employees as part of the evidence of a conspiracy.
 
 
 176
 Under Pennsylvania law, there are two bases of liability for inducement of breach of an at-will employment contract, both of which relate to the defendant's purpose in inducing the employee to leave. The first unlawful purpose is damaging a competitor's business, and the second is inducing the employees to engage in unlawful conduct, such as revealing trade secrets. Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957). Accord, United States Aircraft Corp. v. Boreen, 413 F.2d 694, 699 & n.3 (3d Cir. 1969).
 
 
 177
 In my view, this two-prong test is still the law in Pennsylvania even if one assumes some changes in the wording of the second prong. I find nothing in Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 482 Pa. 416, 393 A.2d 1175 (1978), appeal dismissed, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979), which dealt with inducement of clients not with inducement of at-will employees, to suggest that Martucci does not remain the law of Pennsylvania. In addition, the two-part Martucci test is narrowly drawn for a good reason. If the legal standard is too broad or open-ended, it might interfere with the ability of at-will employees to freely seek out the best jobs. See part III infra. In short, there are strong policy considerations underlying the Martucci formulation, and we have absolutely no indication that Pennsylvania has abandoned these considerations or modified them since that decision was handed down. Accordingly, I would require a clearer indication from the Pennsylvania courts before I would hold that Martucci is no longer governing precedent in this case.
 
 
 178
 Moreover, I will assume, without deciding, that the general wording of interrogatory 4 properly states the second prong of the Martucci test. Nevertheless, general language about "privilege" must not obscure the fact that interrogatory 4 is a separate basis for liability and represents a legal theory distinct from that of interrogatory 2. Whether general phraseology or more specific guidelines are used, the two prongs of the Martucci test must remain analytically distinct. The motive under the second prong must be something other than an intent to destroy or cripple the competitor.
 
 
 179
 There are two possible contexts in which to discuss this issue. On one hand, in considering interrogatory 4, it could be said that the reason ABC had no privilege to induce the employees away was because its motive, at least in part, was to further the conspiracy to depress Franklin Music's market price. On the other hand, in looking at the conspiracy, it is possible to point to the departure of the employees as evidence of the conspiracy. Such a theory requires three distinct analytical steps: (1) Despite the clear answer to interrogatory 2, it must be inferred that the defendants had a less-than-predominant motive to cripple Franklin Music. (2) Then this less-than-predominant motive must be used to find unprivileged conduct under interrogatory 4. (3) Finally, the answer to interrogatory 4 construed in this way must be employed to bolster the conspiracy charge under interrogatory 5.
 
 
 180
 I dispute this theory on two bases. First, because the jury rejected a motive to cripple Franklin Music in its answer to interrogatory 2, that motive cannot be brought back in through interrogatory 4, which rests on an entirely different legal theory. Whether stated in specific or general terms, the second part of the Martucci test relates to inducement for the purpose of getting the employees to engage in improper conduct. If the motive to cripple can be the basis for unprivileged conduct, then interrogatory 4 loses its separate existence and the second prong of Martucci is obliterated.
 
 
 181
 Second, the theory does not comport with the Pennsylvania law of civil conspiracy. As an initial matter, trying to determine a hypothetical mixture of motive from an interrogatory that is worded in a contrary manner is precisely the sort of speculation foreclosed by the "full, clear, and satisfactory" evidence rule applied by Pennsylvania to civil conspiracy. Where the jury found that ABC's motive in hiring Franklin Music employees was not to damage Franklin Music's viability as a business entity, Pennsylvania law prohibits use of the conduct as support for the proposition that ABC and Franklin decided to hurt Franklin Music and thereby depress its market price. Moreover, even if such speculation were proper, there is no evidence in the record upon which it can be based. The plaintiff points to no evidence that demonstrates that ABC had any purpose whatsoever in inducing the employees to cripple Franklin Music. As far as this record shows, we have no proof that ABC had any such intent at all, much less a guideline for determining how much less than predominant the hypothetical intent was. Whatever the merits of the answer to interrogatory 4, the answer to interrogatory 2 provides the jury's dispositive response as to how ABC's conduct vis-a-vis Franklin Music employees relates to the conspiracy charge.
 
 
 182
 The evidence taken as a whole does not satisfy the quantum of proof necessary under Pennsylvania law. It establishes the following: In the summer and fall of 1973, ABC decided to enter the retail record market. It therefore conducted marketing studies that covered several potential competitors, including Franklin Music. It contacted Franklin and at least three other individuals at other firms for information. In the fall, ABC began negotiating with Franklin, an at-will employee, for him to leave his job and discussed with him the possibility of buying Franklin Music. Prior to his departure, the only neglect of duty by Franklin found by the jury was delegation of one task to a subordinate. Franklin did not structure his own work or that of any other employee any different than in the past. He showed ABC officials a store open to the public and a computer produced by IBM. At no time, before or after his departure, did ABC receive any confidential information from him or anyone else. Franklin left after the Christmas rush, a period in which Franklin Music's sales increased. After his departure, he made statements in the trade press that ABC was thinking of buying Franklin Music and facetiously compared the growth rates of ABC and Franklin Music. ABC did make an offer, which Franklin Music rejected as too low. Finally, ABC induced eight other at-will employees of Franklin Music to leave; its purpose was to secure competent employees.
 
 
 183
 In my view, such evidence falls far short of "full, clear, and convincing" proof of a civil conspiracy to depress the market price of Franklin Music. Where a business declines while another firm is considering buying it, there is a natural tendency to find a conspiracy. But especially in areas of competition and shifting allegiances of at-will employees, the courts must look to the objective conduct of the defendants, which here does not support any inference of improper agreement or action. Thus I would agree that the judgment on the conspiracy claim should be reversed.
 
 II. Franklin's Breach of Fiduciary Duty
 
 184
 As demonstrated in the previous section, the jury's verdict was that the only damage accruing from Franklin's alleged breach of fiduciary duty was $25,000 lost due to his delegation of a task to a subordinate. The plaintiff's theory was that in the fall of 1973, first, Franklin delegated a task he normally did himself, and, second, he did not properly supervise the subordinate in question. Neither of these two propositions is supported by the evidence.
 
 
 185
 First, the only witness on this point was Mr. Sukalski, a Franklin Music employee. He testified:
 
 
 186
 (The advertising work) was done occasionally by Mr. Goldstein, it was done occasionally by another young lady always under the supervision of Mr. Franklin, and it was done at his direction.
 
 
 187
 Thus this was not the first time that Franklin delegated advertising work to other employees. Moreover, there was no evidence to show that Franklin had done this particular task every year before the only evidence in the record shows that he "occasionally" delegated this type of work and does not refer to this particular task.
 
 
 188
 Second, there was no evidence of improper supervision. Sukalski wrote a memorandum to Rosen saying he was at a loss to explain the incident. The employee to whom the task was delegated was not called as a witness or even identified. There was no evidence as to the instructions given by Franklin to that employee, whether the employee had experience, whether Franklin acted differently in this instance, or whether Franklin could have averted the loss had he acted differently.
 
 
 189
 Where there was no attempt to show that the incident in this case was unusual and no evidence to explain how the delegation caused the loss, I would find the evidence insufficient to sustain the verdict.
 
 III. Inducement of Employees
 
 190
 As previously shown, under Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957), the answers to interrogatories 2 and 4 require that the defendants' liability here rest on a base separate from the alleged conspiracy. The district court correctly noted that to sustain a verdict on interrogatory 4, one must find that ABC induced the employees to engage in improper acts (e. g., disclosure of trade secrets) or that ABC used improper means in inducing the employees to leave (e. g., fraud, coercion). See United States Aircraft Corp. v. Boreen, 413 F.2d 694, 699 (3d Cir. 1969); Martucci, supra ; Restatement (Second) of Torts §§ 767, comment c, 768, comment e (1979).
 
 
 191
 The record contains no evidence to support either of these two tests. As to the first, the answer to interrogatory 3 establishes that ABC did not receive any confidential information. Nor is there any other evidence in the record that defendants in any way attempted to induce any illegal activity by the employees.
 
 
 192
 As to the improper means test, the district court correctly characterized the evidence as follows:
 
 
 193
 Indulging in all possible inferences in plaintiff's favor, the evidence shows only that Al Franklin may have told Franklin Music employees jobs for them might become available and that he expressed his expectation to the employees and to the press that the future prospects for employees would be greater at ABC than at Franklin Music. In addition, Franklin made statements to the press about the manner in which he hoped ABC would expand, which statements later proved to have no basis in fact. ABC employees in addition to Franklin may have also made ordinary business representations that Franklin Music was not as stable as it appeared on the surface a prediction which was later proven true and that ABC would be a better place to work in the future than Franklin Music.
 
 
 194
 In sum, the record reveals nothing more than an ordinary "sales pitch" to some Franklin Music employees in order to attract them to ABC.
 
 
 195
 The rules relating to inducement of at-will employees serve two purposes. First, they permit competitors to seek out the best employees without the disgruntled employer imposing his loss for departure of the employees on the competing employer. Second, they permit the employee to contract his services freely and at the best price. Thus the at-will employee must not be cut off from his potential employer without evidence of improper conduct. For these reasons, the two-prong test of Martucci must be carefully applied in light of its purpose to the facts in each case.
 
 
 196
 Because the district court applied the correct law to the facts in an accurate manner, I would uphold its grant of judgment n. o. v. on interrogatory 4.
 
 IV.
 
 197
 I agree with Judge Sloviter that the judgment finding that ABC and Franklin conspired to lower the price of Franklin Music should be reversed. I would affirm the district court's grant of judgment n. o. v. on the claim that ABC improperly induced Franklin Music's employees to break their at-will employment contract. I would reverse the judgment on the claims relating to Franklin's breach of fiduciary duty. I agree with the disposition of the remaining substantive claims urged by the plaintiff as grounds for relief. Finally, because of my approach, I do not confront the other trial issues addressed by my colleagues.
 
 
 
 [1]
 See United Aircraft Corp. v. Boreen, 413 F.2d 694, 700 (3d Cir. 1969) (at-will employees secretly preparing to compete with employer while still employed; no breach of fiduciary duties); Spring Steels, Inc. v. Molloy, 400 Pa. 354, 362-64, 162 A.2d 370, 374-75 (1960) (same); J. Reisman and Sons, Inc. v. Snyder's Potato Chips, 31 Somerset Legal J. 77, 87-88 (Pa.Ct.C.P.1975) (offering employment to competitor's at-will employee not actionable unless purpose to harm competitor rather than to gain benefit of employee's service)
 
 
 [2]
 Seaboard Industries, Inc. v. Monaco, 442 Pa. 256, 261-62, 276 A.2d 305, 308-09 (1971) (quoting Lutherland, Inc. v. Dahlen, 357 Pa. 143, 151, 53 A.2d 143, 147 (1947)) (corporate opportunities; officers and directors owe corporation their undivided loyalty); see Higgins v. Shenango Pottery Co., 279 F.2d 46, 52 (3d Cir.) (applying Pennsylvania law; duty of "utmost good faith"), cert. denied, 364 U.S. 899, 81 S.Ct. 232, 5 L.Ed.2d 193 (1960)
 
 
 [3]
 In Part II. C., infra, we discuss the damages that were caused by Franklin's breach of his fiduciary duty to FMC
 
 
 [4]
 E. g., Atlantic & Gulf Stevedores v. Ellerman Lines, 369 U.S. 355, 358-59, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); Tennant v. Peoria & Pekin Union Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944); Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Hodgson v. Lloyd Brasileiro Patrimonio Nacional, 294 F.2d 32, 34 (3d Cir. 1961), cert. denied, 369 U.S. 848, 82 S.Ct. 931, 8 L.Ed.2d 8 (1962) ("appellate court will not interfere with . . . a verdict returned by a jury simply because of its opinion as to the weight or preponderance of the evidence); see McPhee v. Reichel, 461 F.2d 947, 948 (3d Cir. 1972) (court will not disturb jury verdict based on proper instruction and supported by evidence); Mannke v. Benjamin Moore & Co., 375 F.2d 281, 284 (3d Cir. 1967) (appellate court may determine whether verdict on fraud count coincided with applicable evidentiary standard of "clear, precise, and indubitable," but may not "remake" verdict); cf. Vizzini v. Ford Motor Co., 569 F.2d 754, 758 (3d Cir. 1977) (motion for judgment notwithstanding verdict tested by "whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief")
 
 
 [5]
 Compare, e. g., Atlantic & Gulf Stevedores v. Ellerman Lines, 369 U.S. 355, 358-59, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962) (review of jury findings of fact) with Fed.R.Civ.P. 52(a) (clearly erroneous test for trial court findings of fact)
 
 
 [6]
 E. g., Landau v. Western Pa. Nat'l Bank, 445 Pa. 217, 224, 282 A.2d 335, 339 (1971); Fife v. Great Atl. & Pac. Tea Co., 356 Pa. 265, 52 A.2d 24, 27, cert. denied, 332 U.S. 778, 68 S.Ct. 42, 92 L.Ed. 362 (1947); Ballantine v. Cummings, 220 Pa. 621, 630, 70 A. 546, 549 (1908)
 
 
 [7]
 The trial judge, in relevant part, charged the jury:
 Plaintiff contends there was a plan or an agreement among the defendants to issue publicity, systematically solicit employees to cripple defendant, obtain trade secrets, induce employees, induce Mr. Franklin to breach his fiduciary responsibility all for the purpose of acquiring the plaintiff at a depressed price or to otherwise injure the plaintiff.
 Record at 3530 (emphasis added).
 
 
 [8]
 See Blank & Gottschall Co. v. First Nat'l Bank, 355 Pa. 502, 506, 50 A.2d 218, 220 (1947) (mere averment in complaint of conspiracy or fraud insufficient for finding of liability without factual support)
 
 
 [9]
 See Mannke v. Benjamin Moore & Co., 375 F.2d 281, 284 (3d Cir. 1967) ("clear, precise and indubitable" standard for proof of fraud is evidentiary standard to be applied by jury; appellate court may not "remake" jury verdict)
 
 
 [10]
 See note 4, supra, and accompanying text
 
 
 [11]
 Atlantic & Gulf Stevedores v. Ellerman Lines, 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); Barnhart v. Dollar Rent A Car Systems, Inc., 595 F.2d 914, 917 (3d Cir. 1979). As the Supreme Court noted in Atlantic & Gulf Stevedores, to "search for one possible view of the case which will make the jury's findings inconsistent results in a collision with the Seventh Amendment." 369 U.S. at 364, 82 S.Ct. at 786
 
 
 [12]
 See Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 633-34, 136 A.2d 838, 847 (1957) (recognizing two separate torts of interference). Interrogatory 2 and the torts recognized in Martucci are discussed in Part III. E., infra
 
 
 [13]
 In Part II. B., supra, we held that interrogatories 2 and 5, and the jury's answers to them, are reconcilable. In Part III. E., infra, we consider the relationship between interrogatories 2 and 4. We here consider whether interrogatories 4 and 5 are logically consistent
 C appeals from the grant of directed verdict on three of its claims, and on the grant of judgment notwithstanding the verdict on two others.
 
 
 [14]
 Corabi v. Curtis Publishing Co., 441 Pa. 432, 442, 273 A.2d 899, 904 (1971) (citing Restatement of Torts § 614(a) (1938)); Cosgrove Studio & Camera Shop, Inc. v. Pane, 408 Pa. 314, 318, 182 A.2d 751, 753 (1962)
 
 
 [15]
 Pierce v. Capital Cities Communications, Inc., 576 F.2d 495, 502 (3d Cir.), cert. denied, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978)
 
 
 [16]
 Compare Sarkees v. Warner-West Corp., 349 Pa. 365, 367, 37 A.2d 544, 546 (1944) (imputing insolvency, financial embarrassment, credit unworthiness or business failure is actionable libel) with Scott-Taylor, Inc. v. Stokes, 425 Pa. 426, 428-29, 229 A.2d 733, 734 (1967) (exaggerated comparison of apartment house to chicken coop is incapable of defamatory meaning)
 
 
 [17]
 See Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49-50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (outlining difference between rule of reason and per se analyses)
 
 
 [18]
 In Sitkin Smelting & Refining Co. v. FMC Corp., 575 F.2d 440 (3d Cir.), cert. denied, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978), I urged upon this court the view that an agreement in or affecting commerce but having only an unlawful main purpose, could never be justified on a rule of reason basis. Id. at 451 (Gibbons, J., dissenting). While a lawful main purpose might justify a restraint on commerce found to have only a minimal effect upon competition in the marketplace, a conspiracy unlawful at common law should not even trigger a rule of reason inquiry. See Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96, 102-03 (1st Cir.) cert. denied, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932). I still adhere to that position. It was, however, rejected by the Sitkin Smelting majority, and that decision controls
 
 
 [19]
 Chambers v. Montgomery, 411 Pa. 339, 344-45, 192 A.2d 355, 358 (1963); Hughes v. Babcock, 349 Pa. 475, 480-81, 37 A.2d 551, 554 (1944); Focht v. Rabada, 217 Pa.Super. 35, 38, 268 A.2d 157, 159 (1970); see Medvecz v. Choi, 569 F.2d 1221, 1226 (3d Cir. 1977) (applying Pennsylvania law)
 C pleaded, under Pennsylvania law, claims that ABC and Franklin unlawfully interfered with contractual relationships between it and its employees. The district court, relying upon the Pennsylvania Supreme Court's holding in Morgan's Home Equipment Corporation v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957), concluded that Pennsylvania would recognize two possible theories of recovery on the evidence presented. The Martucci decision discusses employment inducement as follows:
 
 
 [20]
 Interrogatory 2 is quoted in Part II. B., supra, and interrogatory 4 is set forth in Part II. D. (2), supra. The jury responded negatively to interrogatory 2 and affirmatively to interrogatory 4. Pennsylvania courts have interpreted the Martucci formulation as setting forth two separate bases of liability. E. g., Albee Homes, Inc. v. Caddie Homes, Inc., 417 Pa. 177, 182, 207 A.2d 768, 771 (1965)
 
 
 [21]
 Justice Roberts, for example, quoted approvingly from Glenn v. Point Park College, 441 Pa. 474, 482, 272 A.2d 895, 899 (1971), wherein the court noted that
 (t)he absence of privilege or justification in the tort under discussion is closely related to the element of intent. As stated by Harper & James, The Law of Torts, § 6.11, at 513-14 ". . . where, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff a line must be drawn and the interests evaluated. This process results in according or denying a privilege which, in turn, determines liability." What is or is not privileged conduct in a given situation is not susceptible of precise definition. Harper & James refer in general to interferences which "are sanctioned by the 'rules of the game' which society has adopted", and to "the area of socially acceptable conduct which the law regards as privileged," id. at 510, 511, and treat the subject in detail in §§ 6.12 and 6.13.
 Adler, Barish, Daniels, Levin, Etc. v. Epstein, 482 Pa. at 432-33, 393 A.2d at 1183-84.
 C offered evidence both of losses and of projected lost profits. As we noted in Part II. C., supra, the amount awarded on the conspiracy claim equals the amount of all actual losses incurred by FMC in fiscal years 1974 through 1977. In addition to the evidence suggesting the amount of those losses FMC offered projections of lost profits for the same years based upon its actual business experience in the previous years. The basis for the extrapolation from this historical experience was fully developed in the testimony by witnesses, including a certified public accountant, who were found to be qualified to make such projections. The projection, if fully accepted by the jury, would suffice to sustain an award for lost profits of $3,388,000. FMC's experts did not, however, go unchallenged. The defendants' experts attacked the methods of projection, the likely effect of a recession on plaintiff's business, and the projected amount. Clearly, then, there was an evidentiary basis upon which an estimate of lost profits could have been made. As we have noted, this is all that Pennsylvania law requires.[22]
 
 
 [22]
 Ashcraft v. C. G. Hussey & Co., 359 Pa. 129, 132-33, 58 A.2d 170, 172 (1948)
 
 
 [23]
 FMC also contends that the trial court erred in excluding evidence bearing on lost profits after 1977. At oral argument we were informed by counsel for FMC that if it received judgment in the amount found by the jury it would not press this alleged error as a basis for a new trial on damages. Therefore we have not considered the contention
 
 
 [1]
 Franklin Music Co. v. American Broadcasting Companies, No. 74-2485 (E.D.Pa. Aug. 4, 1978) (Memorandum and Order) (Appendix at 1560)
 
 
 [2]
 8 W. Holdsworth, A History of English Law, The Common Law and Its Rivals 385 (1926)
 
 
 [3]
 Id. at 392-93; W. Prosser, Law of Torts 293 (4th ed. 1971)
 
 
 [4]
 8 W. Holdsworth, supra note 2, at 395
 
 
 [5]
 Ware and DeFreville, Ltd. v. Motor Trade Ass'n, (1921) 3 K.B. 40, 70; Green v. Davies, 182 N.Y. 499, 75 N.E. 536 (1905)
 
 
 [6]
 James v. Evans, 149 F. 136, 140 (3d Cir. 1906)
 
 
 [7]
 Green v. Davies, 75 N.E. at 537. The decision is criticized in Burdick, Conspiracy As a Crime, and As a Tort, 7 Colum.L.Rev. 229, 232-34 (1907). See also Burdick, The Tort of Conspiracy, 8 Colum.L.Rev. 117 (1908)
 
 
 [8]
 8 Holdsworth, supra note 2, at 392
 
 
 [9]
 Quinn v. Leathem (1901) A.C. 495, 542; Sorrell v. Smith (1925) A.C. 700, 712
 
 
 [10]
 Brackett v. Griswold, 112 N.Y. 454, 20 N.E. 376 (1889)
 
 
 [11]
 See, e. g., Train v. Taylor, 51 Hun. 215, 4 N.Y.S. 492 (1889); Collins v. Cronin, 117 Pa. 35, 11 A. 869 (1887)
 
 
 [12]
 Hood v. Palm, 8 Pa. 237, 239 (1848); ("A conspiracy to defame by spoken words not actionable, would be equally a subject of prosecution by indictment; and if so, then equally a subject of prosecution by action, by reason of the presumption, that injury and damage would be produced by the combination of numbers.")
 
 
 [13]
 Several Pennsylvania cases have indicated that in an action based on a conspiracy theory, recovery may be had against a single defendant if the evidence did not support a finding of conspiracy but did support a finding that one defendant was culpable on the underlying substantive tort. Laverty v. Vanarsdale, 65 Pa. 507 (1870); Collins v. Cronin, 117 Pa. 35, 11 A. 869 (1887); Rundell v. Kalbfus, 125 Pa. 123, 17 A. 238 (1889); Fillman v. Ryon, 168 Pa. 484, 32 A. 89 (1895)
 
 
 [14]
 See Landau v. Western Pa. National Bank, 445 Pa. 217, 282 A.2d 335 (1971); Fife v. The Great Atlantic & Pacific Tea Co., 356 Pa. 265, 52 A.2d 24, cert. denied, 332 U.S. 778, 68 S.Ct. 42, 92 L.Ed.2d 362 (1947); Bausbach v. Reiff, 244 Pa. 559, 91 A. 224 (1914); Ballantine v. Cummings, 220 Pa. 621, 70 A. 546 (1908)
 
 
 [15]
 The alleged conspiracy was to do the following:
 "That (one defendant) Hulbert should court and make love to plaintiff, and lead her to believe that he was intent on marrying her; that he should become engaged to marry her; that by means of the influence and control which the marriage engagement would enable said Hulbert to acquire over plaintiff, he should induce her to transfer her property to him without any, or for an inadequate or nominal consideration; that he should then break the engagement and refuse to marry plaintiff; and that, if she should then seek to recover back her property, the defendants should charge plaintiff with unchastity and threaten to expose and disgrace her, and thereby frighten and prevent her from making any attempt to regain her property from said Hulbert(.)" 90 N.W. at 474.
 
 
 [16]
 Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)
 
 
 [17]
 Callanan v. United States, 364 U.S. at 593-94, 81 S.Ct. 321
 
 
 [18]
 Haldeman v. Martin, 10 Pa. 369, 372 (1849)
 
 
 [19]
 Franklin Union v. The People, 220 Ill. 355, 376-77, 77 N.E. 176, 184 (1906)
 
 
 [20]
 Hopkins v. Oxley Stave Co., 83 F. 912, 920 (8th Cir. 1897); see also Arthur v. Oakes, 63 F. 310, 322 (7th Cir. 1894)
 
 
 [21]
 Plaintiff's Requested Jury Instructions tied the conspiracy interrogatory to the torts. The trial court read to the jury almost verbatim the principal instruction plaintiff requested on this count:
 
 
 [57]
 If you find that defendant ABC sought to acquire Franklin Music's business and in order to acquire that business agreed with Mr. Franklin that Mr. Franklin should violate his duties as an officer and director of Franklin Music, or that Mr. Franklin should interfere with the relationship between Franklin Music and its key employees or Mr. Franklin should misappropriate ABC's trade secrets, then you may find in favor of the plaintiff on count 5. Tr. 3524
 
 
 [22]
 Tr. 3145-46
 
 
 [23]
 The following appears in the colloquy between counsel and the court on the form of the interrogatories:
 THE COURT: . . . If they answer yes, to the three prior questions (the substantive tort interrogatories) then it is immaterial to you, isn't it?
 MR. MARION: I think frankly speaking, yes. (Tr. 3157)
 
 
 [24]
 See Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164, 166-168 (3d Cir. 1979)
 
 
 [25]
 United States v. Northern Pacific Ry., 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); United States v. Container Corp., 393 U.S. 333, 341, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) (Marshall, J., dissenting)
 
 
 [26]
 United States v. Topco Associates, Inc., 405 U.S. 596, 607, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)
 
 
 [27]
 In Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the Court retreated from its per se characterization of vertical customer and territorial restrictions made ten years earlier in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967)
 
 
 [28]
 L. Sullivan, Antitrust § 71, at 194 (1977)
 
 
 [29]
 Id. at 194-95
 
 
 [30]
 P. Areeda & D. Turner, III Antitrust Law P 828b. at 322-323 (1978)
 
 
 [31]
 In the remaining case cited, Van Dyke Ford, Inc. v. Ford Motor Co., 399 F.Supp. 277, 282 (E.D.Wis.1975), the court refused to dismiss the antitrust claim because it charged that the effect of the conspiracy was to foreclose competition, patently consistent with the rule of reason treatment
 
 
 [32]
 See Fashion Originators Guild of America v. FTC, 312 U.S. 457, 468, 61 S.Ct. 703, 85 L.Ed. 949 (1941); see also Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) (clash between federal patent law and state unfair competition law)
 
 
 [1]
 The witness testified to the following allocation of the loss:
 During the months of February, March and April of 1974, we received back from our suppliers a substantial number of ads, marked "returned to account". Money for this ad was not authorized. Listed below are the companies involved and an estimate of the dollars, Columbia $7,000; Schwartz Brothers $2,000; WEA $6,000; UDC which is now Phono Disc, $3,000; CHIPS $2,000; Capitol $2,500; MCA $2,000; Universal $500; and ABC $9(,000).
 If the $9,000 attributable to ABC is subtracted, these sums total $25,000.